STATE OF NEW JERSEY, PLAINTIFF-PETITIONER, v.
FRANK M. MILLER, JR., DEFENDANT-RESPONDENT.

Argued January 25, 1977—Reargued March 7, 1978—
Decided May 24, 1978.

394

*Ms. Marianne Espinosa,* Designated Counsel, argued the cause for petitioner (*Mr. Peter N. Gilbreth,* Deputy At-

torney General, of counsel; *Ms. Espinosa* and *Mr. Gilbreth* on the briefs; *Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

*Mr. E. Neal Zimmermann,* Designated Counsel, argued the cause for respondent *(Mr. Stanley C. Van Ness,* Public Defender, attorney).

The opinion of the court was delivery by

SULLIVAN. J. Defendant was indicted for the murder of Deborah S. Margolin, a 17-year old girl, was tried by jury and found guilty of murder in the first degree. He was sentenced to life imprisonment in State Prison. The principal evidence against him was his oral statement, recorded on tape, made while he was being questioned at police barracks, in which he admitted killing the girl. On appeal, the Appellate Division, in an unreported opinion, reversed the conviction on the ground that defendant's confession was involuntary in the constitutional sense. This Court granted certification of the State's petition. 70 *N. J.* 141 (1976).

The essential facts are as follows. On the morning of August 13, 1973, Deborah Margolin, 17 years of age, was sunbathing on the patio of her parents' farmhouse in East Amwell Township, Hunterdon County. She was wearing a two-piece bathing suit at the time. While she was there a white car drove up to the house and the driver sounded the car's horn several times. The girl's brothers, Daniel and Bernard, from upstairs windows in the house, observed a dusty white vehicle with two severe dents in its right side and its trunk tied shut. The male driver wore loose fitting clothes and "looked like a factory worker." Daniel heard the man tell Deborah that a heifer was loose down at the bottom of the driveway. The girl told her brother that she didn't need any help, got into a family car and drove down the driveway. She was never seen alive again.

Later that afternoon when the girl failed to return home, a search of the area was made and Deborah's body was found face down in a stream. Her throat had been slashed, severing her windpipe and jugular vein. The girl was nude except for a part of her bathing suit around her waist. Stab and cutting wounds had been inflicted in her pelvic area and vagina. Her right breast had been cut.

The description of the car in the driveway given to the police directed immediate attention to defendant who was then on parole from a 1969 conviction of carnal abuse and who had been arrested on July 10, 1973 on another morals charge. The arresting officer in that case, who was also participating in the investigation of the Deborah Margolin homicide, noted that the description of the car seen in the Margolin driveway was similar to the one owned by defendant. Miller's appearance also conformed with the description of the driver of that car given by one of the brothers.

Two police officers located defendant at approximately 10:50 p.m. that same day and interviewed him at a plastics factory in Flemington where he was employed. After some conversation during which defendant gave the officers permission to examine his car which was parked there, defendant agreed to accompany the officers to the Flemington police barracks for further questioning. They arrived at the barracks at about 11:49 p.m. The questioning began about two hours later and lasted for about 58 minutes. The interview was tape recorded.

Defendant initially was read his *Miranda* rights and expressed his willingness to talk without an attorney being present. However, he asked for and was given reassurance of his right to stop at any time and remain silent. Defendant then signed and dated a *Miranda* rights card. In the beginning defendant denied any involvement in the episode at the Margolin farmhouse and the girl's subsequent death. However, he was confronted with time discrepancies in his story as to his whereabouts at the time. The officer pointed out that the description of the vehicle seen in the Margolin drive-

way matched defendant's car to a "T" and that the inspection of defendant's car in the parking lot of the plastics factory disclosed fresh blood in the front seat. The officer said that the description of the driver of the car fitted defendant and the clothes he was wearing. Despite this, defendant continued to insist that he never talked to the girl and that he was not going to admit to something that he "wasn't involved in."

The conversation then got around to the subject of the mental condition of the person who had committed the crime. Defendant said that "whoever did it really needs help." The officer suggested that such a person was not really a criminal who should be punished, but rather needed medical treatment. The officer said he would do all he could to help defendant but that defendant had to help himself first by talking about it.

Finally, the defendant admitted that he was the person who drove up the Margolin driveway and spoke to the girl about the cow. He said that he had driven back to where he had seen the cow, with the girl following him in her car. They started walking through the fields when, according to defendant, he heard the girl scream, he turned and saw a man with a knife cutting the girl. Defendant said he tried to help the girl but the man cut him with the knife and ran away. Defendant put the girl in his car but panicked because he thought she was dead and when he got to a bridge over a stream he "dropped her off" the bridge into the stream.

The officer said that defendant was not being completely honest with him stating "you killed this girl didn't you?" When defendant answered "No I didn't" the officer repeated, "You've got to tell me the truth. I can't help you without the truth." Defendant's reply was

I'm telling you the truth. Sure, that's her blood in the car because when I seen the way she was cut I wanted to help her, and then when she fell over I got scared to even be involved in something like this, being on parole . . .

The officer persisted that truth was the issue, and truth would prevail in the end. He urged defendant "to be truthful with yourself." Defendant began to waver in his denial, saying, "This is going to kill my father." Seizing on the reference to his father, the officer said

[i]f the truth is out, he will understand. That's the most important thing, not, not what has happened, Frank. The fact that you were truthful, you came forward and you said, look I have a problem. I didn't mean to do what I did. I have a problem. This is what's important, Frank.

Defendant then confessed. He said that when they were unable to find the cow, the girl got into his car to go down the road to see if the cow was there. They drove down by the bridge where defendant took a penknife from his pocket and started cutting the girl. Defendant said he had no real recollection of just what he did to the girl or why, although he remembered throwing her body off the bridge. After the incident defendant said he drove home and, using a hose, washed the blood from the seat of the car. In answer to the officer's inquiry, defendant indicated he would be willing to give a formal statement.

Shortly after the questioning was terminated, defendant appeared to go into a state of shock. He slid off the chair onto the floor and had a blank stare on his face. When he did not respond to questions, he was taken to the Hunterdon Medical Center.

The tape recording was the principal evidence against defendant at his trial. It was admitted into evidence over defendant's objection and following a *voir dire* hearing at which defendant testified that he remembered going to the barracks for questioning but had no recollection of his interrogation, as recorded on the tape. According to defendant, the first thing he remembered after being in the barracks' coffee room was when he came to in the medical center.

The trial judge attached no particular significance to defendant's lack of present recollection of the taped interview.

He found the questioning not to have been improper or coercive and that defendant's statement was voluntary and admissible. At the conclusion of the State's case, defendant elected not to take the stand and testify in his own defense.

During the trial an incident took place which defendant claimed also prejudiced his right to a fair trial. Because of the nature of the crime, 16 persons were chosen to hear the case pursuant to *R.* 1:8–2(d). The rule is intended to insure a sufficient number of jurors to render a verdict should a juror die or become ill, disabled or otherwise disqualified from continuing to sit. The rule is particularly useful in a protracted trial where the loss of a juror would otherwise require a mistrial. The rule then provided as follows:[1]

(d) Alternate Jurors; Civil and Criminal Actions. The court in its discretion may direct the impanelling of a jury of such number as is appropriate under the circumstances not to exceed 16, having the same qualifications and impanelled and sworn in the same manner as a jury of 12. If a juror is excused after he has been sworn but before any opening statement is begun, another juror may be impanelled and sworn to take his place. All the jurors shall sit and hear the case, but the court for good cause shown may excuse any of them from service provided the number of jurors is not reduced to less than 12 or 6 as the case may be or such other number as may be stipulated to. If more than such number are left on the jury at the conclusion of the court's charge, the clerk of the court in its presence shall put their names on slips folded to conceal the names, shall place the slips in a suitable box and from it shall draw such number of names as will reduce the jury to the number required to determine the issues. Following the drawing of the names of jurors to determine the issues, the court may in its discretion order that the alternate jurors not be discharged, in which event the alternate jurors shall be sequestered apart from the other jurors and shall be subject to the same orders and instructions of the court, with respect to sequestration and other matters, as the other jurors. If the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or a juror is discharged by the court because he is ill or otherwise unable to continue, the court may direct the clerk to draw the name of an alter-

[1] Effective September 6, 1977 the rule was amended to eliminate the phrase "not to exceed 16" in the fourth line of the rule.

nate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall give the jury such supplemental instructions as may be appropriate.

In the instant case, at the conclusion of the trial, the names of 12 of the 16 jurors were drawn to constitute the jury.[2] However, the court did not discharge the remaining four jurors. Pursuant to the rule, it directed that they be sequestered apart from the other jurors to be available if needed to replace one of the 12 jurors chosen.

After the jury had been deliberating for about an hour and a quarter, it sent a note asking the court "to clarify the definition between first and second degree murder." The jury was recalled and recharged on the distinction between the two degrees of murder, the court to a large extent repeating verbatim the language of its original charge.

Just after the court finished its supplemental instructions and asked the jury to retire to continue its deliberations, and before the jury left the jury box, juror number 11 asked to be dismissed from the jury as he was too nervous and that it was affecting his judgment. In answer to an inquiry by the court the juror said that he did not think he could render a fair verdict.

At the sidebar conference, the prosecutor suggested that the juror be excused and one of the alternate jurors be chosen to take his place. Counsel for defendant stated that he could "hardly object to the withdrawal of a juror who says he can't reach a fair and impartial verdict." However, he opposed substituting a juror after the jury had retired to deliberate. He said that the only remedy was to declare a mistrial.

The court discharged juror number 11 from the panel and had the clerk, by lot, draw the name of one of the al-

---

[2]Under the rule, the proper procedure should have been to reduce the number of jurors to 12 by selecting 4 alternates. No prejudice resulted from this procedural error.

ternate jurors to take the place of the discharged juror. The court then told the jury that it would have to "start over" in its deliberations. About 50 minutes later the jury reported that it had agreed on a verdict. In open court it then returned a verdict finding defendant guilty of murder in the first degree.

The Appellate Division reversed the conviction on the grounds that defendant's confession was the result of intense and mind-bending psychological compulsion and should have been excluded from evidence as involuntary in the constitutional sense. The Appellate Division expressed its "conviction of defendant's guilt" and its "abhorrence at the crime he committed." Nevertheless, it held that the guilty as well as the innocent were entitled to due process and that the use of defendant's confession at his trial required a reversal and a new trial.

We have no quarrel with the legal principles expressed by the Appellate Division. We disagree, though, with its evaluation of the techniques and tactics used by the officer who questioned defendant, as well as its conclusion that defendant's confession was involuntary in the constitutional sense.

Every case must turn on its particular facts. In determining the issue of voluntariness, and whether a suspect's will has been overborne, a court should assess the totality of all the surrounding circumstances. It should consider the characteristics of the suspect and the details of the interrogation. Some of the relevant factors include the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved. *Schneckloth v. Bustamonte*, 412 *U. S.* 218, 226, 93 *S. Ct.* 2041, 2047, 36 *L. Ed.* 2d 854, 862 (1973). A suspect's previous encounters with the law has been mentioned as an additional relevant factor. *State v. Puchalski*, 45 *N. J.* 97, 101 (1965).

Here defendant was a mature man 32 years of age, with some high school education, who had previous experiences with the law. In its finding of voluntariness the trial court emphasized that defendant was "quite familiar" with his *Miranda* rights. There was no indication of low grade or subnormal intelligence on defendant's part. He was oriented, alert and responsive.

The tape recording shows that defendant was advised of his *Miranda* rights and had expressed his willingness to talk to the officer without having an attorney present but first sought and obtained reassurance that he could stop at any time and remain silent. The officer then proceeded to prod defendant about time discrepancies in his story as to his whereabouts at the time the girl left her house. He was reminded of evidence that linked him and his car to the incident. As the trial court noted, an interrogating police officer is not limited to asking a suspect if he committed the crime and if he receives a negative answer, that must be the end of the questioning.

There is a natural reluctance on the part of a suspect to admit to the commission of a crime and furnish details. See *State v. Smith*, 32 *N. J.* 501, 550 (1960), cert. denied, 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961). Efforts by an interrogating officer to dissipate this reluctance and persuade the person to talk are proper as long as the will of the suspect is not overborne. As we said in *Smith, supra,* 32 *N. J.* at 550,

An interrogation, no matter how conscientiously conducted, is naturally bound to be a tense occasion and to evoke apprehension, nervousness and a sense of pressure, no matter what the situation, which will be heightened in a person who knows he is guilty by consciousness of guilt and fear of the legal penalty. It must be recognized that it is not this kind of normal stress, fear and pressure which can make the questioning unfair and a confession involuntary.

The inquiry is whether an interrogating officer can appeal to a suspect by telling him that he is the suspect's friend and wants to help him — that whoever killed this girl is not

a criminal who should be punished, but a person who needs medical treatment. Does the officer have the right to tell the suspect that he must help himself first by telling the truth and then the officer will do what he can to help the suspect with his problem?

It must be conceded that this technique moves into a shadowy area and if carried to excess in time and persistence, can cross that intangible line and become improper. Here, though, the questioning lasted for just less than an hour. While there is an indication that defendant was becoming distressed near the end, this would be a normal reaction as the enormity of what defendant had done was being brought home to him. Defendant had expressed the fear that "this is going to kill my father." Defendant's collapse shortly after completion of his interrogation was the culmination of this realization.

It is evident from the record in this case that the officer's remarks had no appreciable impact on defendant and certainly did not contribute to an "overbearing of his will." Defendant, as previously noted, had been arrested on previous occasions and had a prior conviction for which he had been imprisoned. He was in no way deluded or misled into believing that the state trooper was acting in any capacity other than as an interrogating police officer in the investigation of a serious crime. Miller was fully aware that a murder had been committed which was the subject of the investigation and that he was a prime suspect in the killing. He well knew that should the investigation prove successful and were he to confess he would be charged with the commission of the crime. He was certainly cognizant of the fact that he would be handled through the criminal judicial system and, if found guilty, he would be punished accordingly. There is no basis for concluding that Miller did not have this complete understanding of his situation throughout his interrogation and confession.

Before it can be admitted into evidence and submitted to a jury, a defendant's confession must be proven

by the State to be voluntary beyond a reasonable doubt. *State v. Kelly,* 61 *N. J.* 283, 294 (1972). A confession which is the product of physical or psychological coercion must be considered to be involuntary and inadmissible in evidence regardless of its truth or falsity. However, we disagree with the Appellate Division's suggestion that the use of a psychologically-oriented technique in questioning a suspect is inherently coercive. Questioning of a suspect almost necessarily involves the use of psychological factors. Appealing to a person's sense of decency and urging him to tell the truth for his own sake are applications of psychological principles. Use of a psychiatrically-oriented technique is not improper merely because it causes a suspect to change his mind and confess. The real issue is whether the change of mind was voluntary and not an overbearing of the suspect's will.

██ ██ We find that the interrogation in this case did not exceed proper bounds and that the voluntariness of defendant's confession could properly have been determined by the trial court to be established beyond a reasonable doubt. It was, therefore, properly admitted into evidence. In this connection, we reject defendant's related contentions that his confession was the product of strongly implied promises of an insanity defense and no prison sentence if defendant confessed as having no substantial basis in the record. The same for the contention that the confession was the product of trickery and lies by the police.

We next consider defendant's argument that *R.* 1:8–2(d) is unconstitutional insofar as it permits an alternate juror to be substituted for an original juror after jury deliberations have begun. The contention is that substitution of a juror at this stage of the proceeding infringes on a defendant's right to trial by jury. We considered this question in 1972 when the particular amendment to the rule was proposed. Our adoption of the amendment, effective September 5, 1972, was based on the conclusion that no constitutional obstacle was presented.

Nevertheless, the matter is not completely free from question. In *People v. Ryan,* 19 *N. Y.* 2d 100, 278 *N. Y. S.* 2d 199, 224 *N. E.* 2d 710 (Ct. App. 1966) the New York Court of Appeals struck down a similar provision in the New York Code of Criminal Procedure as violative of the right of trial by jury provided by the New York Constitution. The court held that substituting a juror after deliberations had begun was in effect bringing a 13th juror into the deliberations and that it offended the constitutional provision.

At the opposite pole is *People v. Collins,* 17 *Cal.* 3d 687, 131 *Cal. Rptr.* 782, 552 *P.* 2d 742 (Sup. Ct. 1976), *cert.* denied, 429 *U. S.* 1077, 97 *S. Ct.* 820, 50 *L. Ed.* 2d 796 (1977), where the Supreme Court of California upheld a provision of the Penal Code which provided for substitution of an alternate for an original juror after jury deliberations had begun. The court found this to be constitutionally permissible and not in violation of the right of trial by jury, provided good cause was shown, and the jury was instructed to begin deliberations anew.

The Federal Rule of Criminal Procedure, Rule 24(c), while providing for alternate jurors, permits substitution for regular jurors only prior to the time the jury retires to consider its verdict. However, it has been suggested that this rule be amended "to cover the situation where a juror becomes incapacitated during deliberations or is excused for some other reason." 8A *Moore's Federal Practice,* ¶ 24.05, page 24–36. The Advisory Committee on Rules of Practice and Procedure of the Judicial Conferences of the United States has proposed a change in Rule 24(c) so as to permit alternate juror substitution after jury deliberation has begun.

We find that Rule 1:8–2(d) in providing that for good cause shown, an alternate juror may be substituted for a regular juror after deliberations have begun, does not offend our constitutional guaranty of trial by jury. Certainly good cause appeared when the juror in question

stated that in his then nervous and emotional condition, he did not think he could render a fair verdict. Of course, when an alternate juror is so substituted, the jury must be instructed in clear and unequivocal terms that it is to begin its deliberations anew and that, as the trial judge stated herein, "you are in effect going to have to start over."

The rule is discretionary with the trial court because a situation might arise where it would be unwise to utilize this procedure. The longer the period of time the jury deliberates, the greater is the possibility of prejudice should a juror be substituted or replaced. However, in the circumstances presented herein we find that utilization of the rule provision was not improper. See *State v. Trent*, 157 N. J. *Super.* 231 (App. Div. 1978).

No rule is immutable. The court is always receptive to improvements in our procedures. See *In re National Broadcasting Corporation*, 64 *N. J.* 476 (1974). If it appears that an existing rule, although constitutional, creates trial problems, attention should be given to its continued usefulness. Our Civil and Criminal Practice Committees might well reassess the present utility of this amendment in the light of our five and one-half years experience with it.

A further contention made by defendant is that even though the 1972 rule amendment be held to be constitutional, the trial court committed error, after it replaced juror number 11 with an alternate juror, in not having its supplemental charge read to the substitute juror. It seems to be undisputed that when the supplemental charge was given to the jury as to the distinction "between first and second degree murder," the alternate jurors were not present in the courtroom and did not hear the supplemental charge.

The alternate jurors should have been brought into the courtroom to hear such charge. Rule 1:8-2(d) provides that if alternate jurors are not discharged following

selection of the jury, they are to be sequestered apart from the other jurors but are subject "to the same orders and instructions of the court, * * * as the other jurors."

■ However, we conclude that defendant was not prejudiced by the failure to comply with the rule. The original charge to the entire jury panel including the alternate jurors was an adequate and correct instruction as to the difference between the two degrees of murder. The supplemental charge, to a great extent, repeated, almost verbatim, the original instructions. The entire jury was told that if it needed clarification of any part of the court's charge, it should submit a written request to the court. After the alternate juror was seated no request for clarification was made so that it must be assumed that this juror did not need further instructions. In the circumstances, we find no reversible error.

■ We have considered defendant's additional contention that there should have been a charge on manslaughter. The point is frivolous. There is nothing in the record to support the submission of such an issue to the jury. See *State v. Artis,* 57 *N. J.* 24, 30 (1970).

The judgment of the Appellate Division is reversed and the judgment of conviction, including the sentence imposed, is hereby reinstated.

CONFORD, P. J. A. D. (temporarily assigned), dissenting. I am constrained to dissent from the Court's reversal of the Appellate Division judgment in this case. My grounds are two: (1) the unanimous determination of the Appellate Division that the confession obtained from defendant was extracted from him by means that denied him due process was sound; and (2) the circumstances attending the substitution of a juror during the deliberations of the jury denied the defendant his right to an untainted jury trial. For either or both of these reasons the verdict of guilt should be set aside and the defendant granted a new trial.

## I

I address the confession issue first. It goes without saying that it is not easy for a judge to render an adjudication that results in the vacation of the conviction of an apparently guilty person — especially where the crime is as reprehensible as this one. It is evident from the Appellate Division opinion that that court felt the pressure of the same considerations. But no principle of legal jurisprudence is better settled in this country or more self-evident than that the price of faithful enforcement by the judiciary of the constitutional rights of individuals embedded in the Bill of Rights may on occasion be the setting free or the enforced retrial of a malefactor. Only a year ago Justice Stewart, in a case comparable to the instant one in its tension between the demands of law enforcement and those of vindication of individual constitutional rights, felt moved to say, in expressing the reasons of the Supreme Court for vacating a conviction:

> The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder and the victim a small child. But it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all.
> *Brewer v. Williams*, 430 *U. S.* 387, 406, 97 *S. Ct.* 1232, 1243, 51 *L. Ed.* 2d 423 (1977).

Previously, in a confession case, Chief Justice Warren had said:

> The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.

*Spano v. New York,* 360 *U. S.* 315, 320–321, 79 *S. Ct.* 1202, 1206, 3 *L. Ed.* 2d 1265 (1959). See also *Mapp v. Ohio,* 367 *U. S.* 643, 659, 81 *S. Ct.* 1684, 6 *L. Ed.* 2d 1081

(1961); *Olmstead v. United States,* 277 *U. S.* 438, 485, 48 *S. Ct.* 564, 72 *L. Ed.* 944 (1928) (Justice Brandeis, dissenting).

This Court has been equally faithful to these high principles. In *State v. Macri,* 39 *N. J.* 250, 266 (1963), Justice Jacobs stated:

> State judges, no less than federal judges, have the high responsibility of protecting constitutional rights. While they, no less than law enforcement officers, are disturbed when the guilty occasionally go unpunished, they tolerate that as the incidental cost of insuring the continued effectiveness of the guaranties afforded by the Constitution to all of us as free men.

All members of this Court, each conscientiously voting his own views on the merits of this troublesome issue, are bound at least to realize that an affirmance of the conviction in this case signals to the law-enforcement community that the method of interrogation of this defendant resulting in the confession before us is unexceptionable and may be freely practiced. I cannot join in such a signal.

All members of the Court agree that an involuntary confession — one extracted from a suspect by physical or psychological coercion on the part of the police — cannot be used in a trial of the suspect, as a matter of his right not to be deprived of his liberty without due process. *Brown v. Mississippi,* 297 *U. S.* 278, 56 *S. Ct.* 461, 80 *L. Ed.* 682 (1936); *McCormick on Evidence* (1972) § 149, p. 317. Although the cases recognize that no single test of involuntariness can be formulated, the essence of the controlling rationale is found in the statement in *Culombe v. Connecticut,* 367 *U. S.* 568, 602, 81 *S. Ct.* 1860, 1879, 6 *L. Ed.* 2d 1037 (1961):

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if

his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. * * * The line of distinction is that at which governing self-direction is lost, and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

Another view of the matter, drawing from earlier cases, was reformulated in *Malloy v. Hogan*, 378 *U. S.* 1, 7, 84 *S. Ct.* 1489, 1493, 12 *L. Ed.* 2d 653 (1964), where the Court said:

* * * the constitutional inquiry is not whether the conduct of state officers in obtaining the confession is shocking, but whether the confession was 'free and voluntary: that is [it] must not be extracted by any sort of threat or violence, *nor obtained by any direct or implied promises, however slight*, nor by the exertion of any improper influence * * *.' (emphasis added).

In *Miranda v. Arizona*, 384 *U. S.* 436, 448, 86 *S. Ct.* 1602, 1614, 16 *L. Ed.* 2d 694 (1966), the Court noted:

* * * we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. * * * this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.

No two cases are alike; all must be decided on the totality of the circumstances. But ultimately "neither the body nor mind of an accused may be twisted until he breaks." *Culombe v. Connecticut, supra*, 367 *U. S.* at 584, 81 *S. Ct.* at 869.

Of importance to a resolution of this appeal is an understanding of the burden of proof of the State to establish the voluntariness of an impugned confession and of the scope of review by an appellate court on such an issue. This Court has plainly established the burden of proof on the State as that of proving voluntariness of a confession beyond a reasonable doubt. *State v. Yough*, 49 *N. J.* 587, 601 (1967); *State v. Kelly*, 61 *N. J.* 283, 294 (1972). As to scope of appellate review, since the issue is of constitutional dimension

and is one of mixed fact-law, the reviewing court conducts a sweeping surveillance of the question practically the equivalent of *de novo* redetermination.[1] *Beckwith v. United States,* 425 *U. S.* 341, 348, 96 *S. Ct.* 1612, 48 *L. Ed.* 2d 1 (1976); *Spano v. New York, supra,* 360 *U. S.* at 316, 79 *S. Ct.* 1202 (1959); *State v. Contursi,* 44 *N. J.* 422, 428, n. 2 (1965); *State v. Smith,* 32 *N. J.* 501, 544, 549 (1960), *cert.* den. 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961), and see *State v. Johnson,* 42 *N. J.* 146, 160, n. 2 (1964).

In view of the foregoing, and the circumstances that all subordinate facts relating to the voluntariness of this confession were essentially uncontested (the court had available the verbatim transcript of a taping of the entire interrogation at the police station), the Appellate Division had the ultimate responsibility of determining independently for itself whether the State had carried its burden of establishing *beyond a reasonable doubt* that the confession was voluntary, *i. e.,* that "neither the body nor mind" of Miller was "twisted until he [broke]." *Culombe v. Connecticut, supra,* 367 *U. S.* at 584, 81 *S. Ct.* at 1860. That the Appellate Division cannot fairly be said to have erred in finding that the State did not meet its burden is best demonstrated by setting forth its opinion substantially in its entirety, as follows:

"PER CURIAM

"Defendant was convicted by a jury of murder in the first degree. He appeals on a number of grounds. The principal one of these is a challenge to the voluntariness of a confession.

"We are extraordinarily fortunate in having before us the transcript of a tape recording made during the interrogation which led to the confession. This obviates any

---

[1] If there are contested issues as to subordinate facts involving credibility of witnesses, deference may be accorded any fact-findings thereon by the trial judge. See *State v. Bowden,* 62 *N. J. Super.* 339, 349 (App. Div.) certif. den. *sub nom. State v. Duffy,* 33 *N. J.* 385 (1960).

need to speculate with respect to that which transpired. Operating, then, from this unique vantage point, we first declare our allegiance to the 'decent' hope that a guilty man may stub his toe. *State v. McKnight,* 52 *N. J.* 35, 52 (1968). Then we deplore the techniques and tactics which extracted this confession and which, in our judgment, denied defendant due process of the law.

"A *Miranda (Miranda v. Arizona,* 384 *U. S.* 436 [86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694] (1966)) *voir dire* was held. Thereafter the judge found, in findings adequately supported by credible evidence in the whole record (*State v. Johnson,* 42 *N. J.* 146 (1964)), that *Miranda* warnings were given and in a timely manner. Then the trial judge, recognizing the 'only real problem' as being one of 'whether or not there was any cajolery, inducement, combination thereof that overcame the will of the defendant so that his subsequent answers to the several questions were not, "voluntary",' and relying upon the definition of 'voluntary' found in *Schneckloth v. Bustamonte,* 412 *U. S.* 218 [93 *S. Ct.* 2041, 36 *L. Ed.* 2d 854] (1973), determined the confession to be admissible. He said,

I don't think there was any trickery either apparent or inferable in this statement. The most that can be said as [defense counsel] has indicated a promise of help. There is no question that is in the statement, but I do not find that promise was such as to cause this confession to be inadmissible and therefore it will be received in evidence subject to certain deletions about which we should talk now I presume.

"We are clearly persuaded of error in this determination.

"The tape transcript must be read in its entirety for its full aroma to be savored. The interrogation began (at two o'clock in the morning) gently enough with a recitation of an earlier discussion between the interrogating trooper and defendant at the latter's place of work. It prodded defendant (almost kindly; the trooper con-

tinually addressed defendant both patronizingly and· by his first name) about his whereabouts and activities on the previous day. Then a minor discrepancy in defendant's timetable arose. The trooper pressed his advantage, again gently. 'Okay, now,' he told defendant, 'this is a problem.' Defendant said, 'I realize this . . .'

"Then the trooper pointed out that defendant's vehicle had some damage, some red clay or dirt, and[1]

T: There was blood found on the left front interior portion of your vehicle, tonight, fresh blood.
D: Fresh blood?
T: Yes, sir. This is very, very serious.
D: I realize this.
T: That's point 3. * * *

"Then came the first significant police statement, assertedly untrue because as defendant graphically points out in his brief, 'no evidence at all of this crucial fact was presented at trial.'

T: We have a witness, Frank, now this is point 4. We have a witness who identified your car, who, no, I'm, I'm sorry, let me, I shouldn't say your car, who identified a vehicle that fits the description of your car, at this girl's home, speaking with her, telling her something about a cow being loose. Someone who was there who wanted to help her, they didn't want to hurt this girl, they didn't want to hurt this girl, Frank, they wanted to help her. ·You see,· I know this, I know that, . . .
D: Yeah.

"If this was untrue, what followed immediately thereafter was obviously designed to capitalize on the chicane:

T: . . . because I can appreciate that, because I would have done the same thing. If there was something to be rectified,· or

---

[1]In transcript quotations hereafter, 'T:' signifies the question or comment from the trooper, and 'D:' signifies defendant's response. Emphasis in any of the quotations which follow from the tape transcript is, of course, added.

if somebody had a problem, I would have done the same thing. I would have wanted to help her. The vehicle that came onto the property . . .

D: Right.

T: . . . fits the description of your vehicle.

D: It does.

T: Yes. Now, that's the fourth point. And when I say fits the description, what I mean, Frank, is it fits the description to a 't', and as we talked about before, how many other vehicles are there like yours in the County right now?

D: There shouldn't be too many, if any . . .

T: If any . .

D: . . . because of the damage on the right-hand side.

T: Now, what would your conclusion be under those circumstances, if someone told you that?

D: I'd probably, uh, have the same conclusion you got.

T: Which is what?

D: That I'm the guy that, that did this.

T: That did what?

D: Committed this crime.

"The trooper then told defendant that 'we have a physical description * * * from another witness' which 'fits you and the clothes you were wearing.' Defendant also challenges the truthfulness of this statement. In any event, that which had proceeded provided all the stage that was needed for that which followed. The trooper embarked doggedly on a campaign marked by (1) his insistence that defendant was not a criminal and did not have a criminal mind and (2) persistent offers 'to help.' Typical of that which was to occupy a good portion of the balance of this fifty-eight minute grilling was what then transpired:

T: Frank, I don't think you're a criminal. I don't think you're a criminal. I don't think you have a criminal mind. As a matter of fact, I know you don't have a criminal mind, because we've been talking now for a few hours together, haven't we?

D: Right.

T: Right?

D: Yeah.

T: You don't have a criminal mind.

D: No.

T: I know you don't. But, like I noted before, we all have problems.

D: Right.

T: Am I right?

D: Yeah, you said this over there at the plant.

T: And you agree with me?

D: Yes, sir.

T: I have problems and you have.

D: Right.

T: Now, how do you solve a problem?

D: That depends on the problem.

T: Your problem, how do we solve it? How are we going to solve it?

D: This I don't know.

T: Do you want me to help you solve it?

D: Yeah.

T: You want me to extend all the help I can possibly give you, don't you?

D: Right.

T: Are you willing to do the same to me?

D: Yeah.

T: Now, I feel . . .

D: Yeah.

T: . . . who is ever, whoever is responsible for this act . . .

D: Yeah.

T: He's not a criminal. Does not have a criminal mind. I think they have a problem.

D: Uh, huh.

T: Do you agree with me?

D: Yeah.

T: They have a problem.

D: Right.

T: A problem, and a good thing about that Frank, is a problem can be rectified.

D: Yeah.

T: I want to help you, I mean I really want to help you, but you know what they say, God helps those who help themselves, Frank.

D: Right.

T: We've got to get together on this. You know what I'm talking about, don't you?

D: Yeah, especially if they're trying to say that, you know, that like you say, I'm identified and my car's identified, and uh, we got to get together on this.

T: Yes we do. Now, that's only a few of the items . . .

D: Uh, huh.

T: . . . that we have now. Your problem, I'm not, let's forget this incident, okay . . .

D: Yeah.

T: . . . let's forget this incident, let's talk about your problem. *This is what, this is what I'm concerned with, Frank, your problem.*

D: Right.

T: If I had a problem like your problem, I would want you to help me with my problem.

D: Uh, huh.

T: Now, you know what I'm talking about.

D: Yeah.

T: And I know, and I think that, uh, a lot of other people know. You know what I'm talking about. *I don't think you're a criminal, Frank.*

D: *No, but you're trying to make me one.*

T: *No I'm not, no I'm not,* but I want you to talk to me so we can get this thing worked out. This is what I want, this is what I want, Frank. I mean it's all there, it's all there. I'm not saying . . .

"The will-abrading grind continued:

D: If she [the victim] was to walk in here now, I wouldn't know, know that she was the girl that, uh, you're talking about.

T: But you were identified as being there talking to her minutes before she was . . . probably this thing that happened to her. How can you explain that?

D: I can't.

T: Why?

D: I don't know why, but I, I, you know, how can I explain something that I don't know anything about.

T: *Frank, look, you want, you want help, don't you Frank?*

D: *Yes, uh huh, yes, but yet I'm, I'm not going to admit to something that, that I wasn't involved in.*

T: *We don't want you to, all I want you to do is talk to me, that's all. I'm not talking about admitting to anything Frank.* I want you to talk to me. I want you to tell me what you think. I want you to tell me how you think about this, what you think about this?

D: What I think about it?

T: Yeah.

D: I think whoever did it really needs help.

T: And that's what I think and that's what I know. *They don't, they don't need punishment, right? Like you said, they need help.*

D: Right.

T: They don't need punishment. They need help, good medical help.

D: That's right.

T: . . . to rectify their problem. *Putting them in, in a prison isn't going to solve it, is it?*

D: No, sir. I know, I was in there for three and a half years.

T: That's right. That's the, that's not going to solve your problem is it?

D: No, you get no help down there. The only thing you learn is how to, you know . . .

T: Well, let's say this Frank, suppose you were the person who needed help. What would you want somebody to do for you?

D: Help me.

T: In what way?

D: In any way that they, they see, you know, fit, that it would help me.

"The trooper induced defendant to say that whoever committed the deed probably had a mental problem. Then he asked defendant if he had ever been "examined." Upon being advised that he had been tested, the trooper then directed his energies to convincing defendant that he 'might not be responsible for' his acts but that the blame was in others for their inability to help him.

T: Well, then did you still feel this way that something might happen it would be their fault because, *as far as I'm concerned if something did happen, it's not your fault,* its their fault . . .

D: Right.

"The trooper acknowledged that defendant was becoming 'very, very nervous.' The time had come.

T: Now listen to me Frank. This hurts me more than it hurts you, because I love people.

D: It can't hurt you anymore than it hurts me.

T: Okay, listen Frank, I want you . . .

D: I mean even being involved in something like this.

T: Okay, listen Frank. If I promise to, you know, do all I can with the psychiatrist and everything, and we get the proper help for you, and get the proper help for you, will you talk to me about it?

D: I can't talk to you about something I'm not . . .

T: Alright, listen Frank, alright, honest. I know, I know what's going on inside you, Frank. I want to help you, you know, between us right now. I know what going on inside you. Frank, you've got to come forward and tell me that you want to help yourself. You've got to talk to me about it. This is the only way we'll be able to work it out. I mean, you know, listen, I want to help you, because you are in my mind, you are not responsible. You are not responsible, Frank. Frank, what's the matter?

D: I feel bad.

T: Frank, listen to me, honest to God, I'm, I'm telling you, Frank, (inaudible). I know, it's going to bother you, Frank, it's going to bother you. It's there, it's not going to go away, it's there. It's right in front of you, Frank. Am I right or wrong?

D: Yeah.

T: You can see it Frank, you can feel it, you can feel it but you are not responsible. This is what I'm trying to tell you, but you've got to come forward and tell me. Don't, don't, don't let it eat you up, don't, don't fight it. You've got to rectify it, Frank. *We've got to get together on this thing, or I, I mean really, you need help, you need proper help and you know it, my God, you know, in God's name you, you, you know it. You are not a criminal, you are not a criminal.*

"That was enough. Defendant had been told in the name of God he was not a criminal.

D: Alright. Yes, I was over there and I talked to her about the cow and left. I left in my car and I stopped up on the road where, you know, where the cow had been and she followed me in her car . . .

"Even the recitation of the details was interrupted with relentless and successful Svengalian efforts. At one point the trooper interjected, 'Let it come out, Frank. I'm here, I'm here with you now. I'm on your side, I'm on your side, Frank. I'm your brother, you and I are brothers Frank. We are brothers, and I want to help my brother.'

"Defendant's continued insistence that despite his presence at the scene, he was not the killer could not long resist the tremendous psychological pressure.

T: You killed this girl didn't you?

D: No, I didn't.

420

T: Honest, Frank? It's got to come out. You can't leave it in. It's hard for you, I realize that, how hard it is, how difficult it is, I realize that, but you've got to help yourself before anybody else can help you. And we're going to see to it that you get the proper help. This is our job, Frank. This is our job. This is what I want to do.

D: By sending me back down there.

T: Wait a second now, don't talk about going back down there. First thing we have to do is let it all come out. Don't fight it because it's worse, Frank, it's worse. It's hurting me because I feel it. I feel it wanting to come out, but it's hurting me, Frank. You're my brother, I mean we're brothers. All men on this, all men on the face of this earth are brothers, Frank, but you got to be completely honest with me.

D: I'm trying to be, but you don't want to believe me.

T: I want to believe you, Frank, but I want you to tell me the truth, Frank, and you know what I'm talking about and I know what you're talking about. You've got to tell me the truth. I can't help you without the truth.

D: I'm telling you the truth. Sure, that's her blood in the car because when I seen the way she was cut I wanted to help her, and then when she fell over I got scared to even be involved in something like this, being on parole and . . .

T: I realize this, Frank, it may have been an accident. Isn't that possible, Frank? Isn't that possible?

D: Sure, it's possible.

T: Well, this is what I'm trying to bring out, Frank. It may be something that, that you did that you can't be held accountable for. This is, I can help you, I can help you once you tell me the truth. You know what I'm talking about. I want to help you, Frank. I like you. You've been honest with me. You've been sincere and I've been the same way with you. Now this is the kind of relationship we have, but I can't help you unless you tell me the complete truth. I'll listen to you. I understand, Frank. You have to believe that, I understand. I understand how you feel. I understand how much it must hurt you inside. I know how you feel because I feel it too. Because some day I may be in the same situation Frank, but you've got to help yourself. Tell me exactly what happened, tell me the truth, Frank, please.

D: I'm trying to tell you the truth.

T: Let me help you. It could have been an accident. You, you've got to tell me the truth, Frank. You know what I'm talking about. I can't help you without the truth. Now you know and I know that's, that's, that's all that counts, Frank. You know and I know that's what counts, that's what it's all about. We can't hide it from each other because we both

know, but you've got to be willing to help yourself. You know, I don't think you're a criminal. You have this problem like we talked about before, right?

**D:** Yeah, you, you say this now, but this thing goes to court and everything and you . . .

**T:** No, listen to me, Frank, please listen to me. The issue now is what happened. The issue now is truth. Truth is the issue now. You've got to believe this, and the truth prevails in the end, Frank. You have to believe that and I'm sincere when I'm saying it to you. You've got to be truthful with yourself.

**D:** Yeah, truth, you say in the end, right? That's why I done three and a half years for . . .

**T:** Wait, whoa . . . whoa

**D:** . . . for a crime that I never committed because of one stinkin detective framing me. . .

**T:** Frank, Frank.

**D:** . . . by the name of Rocco.

**T:** Frank, you, you're talking to me now. We have, we have a relationship, don't we? Have I been sincere with you, Frank?

**D:** Yeah, you . . .

**T:** . . . Have I been honest?

**D:** . . . Yes.

**T:** Have I defined your problem, Frank? Have I been willing to help you? Have I stated I'm willing to help you all I can?

**D:** Yes.

**T:** Do I mean it?

**D:** Yes.

**T:** Whenever I talk to anybody I talk the same way, because you have a very, very serious problem, and we want to prevent anything in the future. This is what's important, Frank, not what happened in the past. It's right now, we're living now, Frank, we want to help you now. You've got a lot more, a lot more years to live.

**D:** No, I don't.

**T:** Yes, you do.

**D:** No, I don't.

**T:** Don't say you don't. Now you've got to tell me.

**D:** Not after all this, because this is going to kill my father.

**T:** Listen, Frank. There is where you, the truth comes out. Your father will understand. This is what you have to understand, Frank. If the truth is out he will understand. That's the most important thing, not, not what has happened, Frank. The fact that you were truthful, you came forward and you said, look I have a problem. I didn't mean to do what I did. I have a problem, this is what's important, Frank. This is very important, I got, I, I got to get closer to you, Frank, I

got to make you believe this and I'm, and I'm sincere when I tell you this. You got to tell me exactly what happened, Frank. That's very important. I know how you feel inside, Frank, it's eating you up, am I right? It's eating you up, Frank. You've got to come forward. You've got to do it for yourself, for your family, for your father, this is what's important, the truth, Frank. Just tell me, you didn't mean to kill her did you?

"Defendant's capitulation to the superior mind was complete:

D: I thought she was dead or I'd have never dropped her off like that.

" 'I mean, Frank,' the trooper said, 'this is hurting me, God listen. I just want you to come out and tell me, so I can help you, that's all.'

"At the end of the interrogation and before a written statement could be prepared, Frank Miller collapsed physically. In his testimony the trooper candidly described it as 'a state of shock. * * * Mr. Miller had been sitting on a chair, had slid off of the chair on to the floor maintaining a blank stare on his face, staring straight ahead and we were unable to get any type of verbal response from him at that time.'

"A first aid squad was contacted. Defendant was taken to a hospital.

"Our concern for the treatment of defendant and the patent denial of due process is substantially tempered by our conviction of defendant's guilt. We now agonize over the necessity for giving an edge to one whom the police authorities reasonably, and very probably correctly, believed to be guilty of a most heinous crime, involving the greatest of all criminal wrongs, murder. But we have no doubt at all of our duty. An overbearing broadside which results in a confession by virtue of intense and mind bending psychological compulsion deserves no better fate at our hands than does the legendary rubber hose. *Chambers v. Florida*, 309 *U. S.* 227 [60 *S. Ct.* 472, 84

*L. Ed.* 716] (1940). We have long cherished a determination that the fair winds of due process shall blow upon the guilty as well as the innocent. We will not here let our gratitude for good police work which ferreted out one who is most probably a murderer, and our abhorrence at the crime he committed, cause us to abandon basic constitutional principles.

"Thus, in the circumstances here, defendant's confession was involuntary in the constitutional sense and is inadmissible. The error in its admission requires a reversal and a new trial.

"Broadly based as is our conclusion of law, we need not further wrestle with subordinate problems related to defendant's claims that the confession was the product of express promises of psychiatric help, such as that there were 'strongly implied' promises of an insanity defense and no prison sentence, that the police lied to defendant in order to obtain the confession and so forth. Our determination also makes it unnecessary for us to decide many other issues raised on the appeal.

\*  \*  \*  \*  \*  \*  \*

"Reversed and remanded for a new trial."

I find myself in full accord with the foregoing opinion and its characterization of the trooper's tactics as constituting "[a]n overbearing broadside which result[ed] in a confession by virtue of intense and mind bending psychological compulsion." An aspect of this psychological compulsion which at the same time constitutes an independently sufficient basis for a finding of involuntariness consists of the repeated promises made to the defendant by the trooper that defendant would receive the psychiatric help he needed, not punishment, and that he would not be imprisoned ("that's [prison] (sic) is not going to solve your problem, is it?") because he was not a "criminal," but only had a "problem," impliedly a mental one; society, not defendant, was at fault because it had not properly treated him in prior institutionalization. See the quotation from *Malloy*

*v. Hogan, supra,* at p. 411 above (378 *U. S.* at 7, 84 *S. Ct.* 1489) ; *State v. Smith, supra,* 32 *N. J.* at 542; *State v. Cole,* 136 *N. J. L.* 606, 611 (E. & A. 1947).

While length of time and place of interrogation are conditions bearing upon the totality of circumstances to which consideration must be given, and it is true that only the last hour of the confrontation was at a State police station, this episode had been immediately preceded by almost an hour of interrogation at defendant's work place and about two hours of detention at the police station in the early ·morning hours. But the significant thing here is that only a small part of the taped episode was interrogation in any legitimately investigative sense. For the most part, it was plainly, bluntly and persistently an effort to break the will of the defendant. The tactic was an appeal to his emotions and his need for medical help and the misleadingly comforting assurances of the trooper, as defendant's "brother," hypnotically reiterated at length, that he was not a "criminal" requiring imprisonment and that he must unburden himself as a prelude to the "help" which would be provided by the State to assuage his "problem." *Cf. Leyra v. Denno,* 347 *U. S.* 556, 560–561, 74 *S. Ct.* 716, 98 *L. Ed.* 948 (1954) ; and see *Miranda v. Arizona, supra,* 384 *U. S.* at 450, 86 *S. Ct.* 1602. The total physical collapse of the defendant at the end, after repeated earlier assurances by defendant to the trooper that he was not involved in the crime, cogently evidences the effect of the trooper's blandishments on defendant's mind and emotions. A will resolved not to confess was coerced into one to do just that.

The opinion of the Appellate Division notes that "[t]he tape transcript must be read in its entirety for its full aroma to be savored." The members of this Court have not only read the transcript but listened to the entire tape. The experience, to me, corroborates the impression of the Appellate Division as to the gentleness of the commencement of the colloquy, but it also communicates the inception and gradual increase of a tone of urgency, insistence and pres-

sure in the trooper's voice as he bears down on his subject. If the sole object of police interrogation is detection and procurement of evidence of crime the trooper cannot be faulted. But if the values underlying the privilege against self-incrimination in a civilized society still live, as assuredly they do, see *State v. Deatore,* 70 *N. J.* 100 (1976); *McCormick on Evidence, op. cit., supra,* at p. 315, they may not be eroded by judicial solicitude for the affirmance of a conviction of an apparently guilty person at the expense of a dispassionate evaluation of a contention that a confession was extracted from a defendant by overbearing his free will. In my judgment, the State has fallen far short of its obligation to establish beyond a reasonable doubt (if at all) that that did not happen in the case of this defendant. If I am right, the conviction must be reversed on that ground *per se. Chapman v. California,* 386 *U. S.* 18, 23, 87 *S. Ct.* 824, 17 *L. Ed.* 2d 705 (1967).

Although not strictly material to the issue before us, there is a substantial possibility that even were defendant acquitted because of the inadmissibility of the confession, he could be committed civilly under *R.* 4:74–7 in view of his prior mental history, the circumstances in the instant case pointing to his implication in this murder and the "preponderance-of-the evidence" rule applicable in commitment law, as distinguished from that of "beyond a reasonable doubt" in criminal cases. See *State v. Krol,* 68 *N. J.* 236, 257 (1965). Accordingly, the alternative potentialities facing the Court in determining this matter are not necessarily confined to affirming the conviction or setting the defendant free.[2]

## II

The circumstances attending the substitution of an alternate juror during the deliberations of the jury are

---

[2] I here assume, as is not at all certain, that defendant could not be convicted at a retrial without use of the confession.

recounted in Justice Sullivan's opinion for the Court. In my view, the practice rule, *R.* 1:8–2(d), is not facially invalid, but is susceptible of unconstitutional application, as I believe occurred in this instance.

It is obvious that if a jury which renders a verdict has consulted with one not a juror in the course of its deliberations that verdict is tainted by the potential influence in the ultimate verdict of the participation of the stranger in the deliberations. In principle, the instant situation cannot be differentiated from that just posed. Eleven of the jurors who concurred in the verdict were subject for an hour and a half to the views, opinions and influence of the juror subsequently excused. In effect, he was a 13th juror. See *People v. Ryan,* 19 *N. Y.* 2d 100, 278 *N. Y. S.* 2d 199, 224 *N. E.* 2d 710 (Ct. App. 1966); A. B. A. *Standards Relating to Trial by Jury* (Approved Draft 1968) § 2.7 at 81-82. But see *People v. Collins,* 17 *Cal.* 3d 687, 131 *Cal. Rptr.* 782, 552 *P.* 2d 742 (Sup. Ct. 1976), *cert.* den. 429 *U. S.* 1077, 97 *S. Ct.* 820, 50 *L. Ed.* 2d 796 (1977). Indeed, those eleven jurors were exposed to the influence of the discharged juror for a substantially longer period of time than their deliberations with the substituted juror. Moreover, the substituted juror had not been exposed to the deliberations, views and influence of the eleven jurors mutually expressed and exerted before he came upon the scene.

In the present circumstances, an admonition to a jury that they forget what happened before and start their deliberations anew with the substituted juror cannot excise the taint of an ultimate verdict in respect of the two objections cited above.

I have indicated that I do not believe the practice rule to be facially invalid. By this I mean that if a juror had to be excused at a very early stage in the deliberations the trial judge could exercise his discretion as to whether the period elapsed was so short that, upon instructions to the reconstituted jury to begin deliberations entirely anew, the

extraneous factors would become *de minimis* and the right of jury trial substantially untrammeled. Possibly, also, original deliberations, although extended beyond the very early stages, prior to substitution of a juror, could be held constitutionally harmless on motion for a new trial or on appeal if the deliberations of the reconstituted jury went on for many times the period prior to substitution. Such a situation might have been presented here if the jury deliberations after the substitution and prior to the verdict had extended for a period of days.

I regard the practical utility of the practice rule to warrant saving it from a declaration of facial invalidity. However, fidelity to the constitutional right of jury trial impels me to hold the rule unconstitutional as here applied, for the reasons stated above.

I agree with the Court's disposition of the question raised by defendant concerning the failure to read the supplemental charge to the substituted juror.

I would affirm the judgment of the Appellate Division.

HALPERN, P. J. A. D. (temporarily assigned), dissenting. I am in complete accord with Judge Conford's dissent that defendant's confession was involuntary and, therefore, join him in Point I.

I also agree with Judge Conford that if *R.* 1:8-2(d) is facially valid[1] it was unconstitutionally applied in this case. However, as I have strong reservations as to its facial validity, I deem it advisable to supplement Judge Conford's views on this subject without discussing the conflict which exists in other jurisdictions referred to by the majority and Judge Conford in their opinions.

It is essential that we note at the outset that *N. J. S. A.* 2A:74-2, and its predecessor statutes, permitted a trial judge, in his discretion, to impanel a jury not to exceed

---

[1] In view of our conclusion that the confession was invalid it is unnecessary to pass upon the facial validity of *R.* 1:8-2(d).

14, in civil and criminal 'cases, and for "good cause" excuse any of them from service provided the number was not reduced to less than 12. At the end of his charge, a method of selecting 12 to decide the case was provided. No provision is made in the statute for substituting a juror after deliberations had commenced. When the statute was finally amended in 1975 (after this case had been completed), insofar as it has any bearing here, the only change made was to increase the eligible number of alternate jurors to such number as the trial judge deemed appropriate. It is R. 1:8–2(d) which was in effect when the instant case was tried. The Rule authorized a trial judge, in his discretion, to substitute an alternate after submission of the case to the jury if "* * * a juror dies or a juror is discharged * * * because he is ill or otherwise unable to continue * * *."[2]

If R. 1:8–2(d) made no provision for substitution of jurors after the jury's deliberations had commenced, as is the case in the federal courts, it unquestionably would be facially valid.[3] The statute and R. 1:8–2(d) were undoubtedly adopted as a practical method to avoid the danger of a mistrial through death, illness or incapacity of a juror to continue as well as to preserve the time, efforts and expenses of the court, the attorneys, the litigants and all

---

[2]The issue of whether the rule is invalid because it deals with substantive law rather than practice and procedure, was not raised or argued and need not be decided. See *Winberry v. Salisbury*, 5 *N. J.* 240 (1950), *cert.* den. 340 *U. S.* 877, 71 *S. Ct.* 123, 95 *L. Ed.* 638 (1950).

[3]*Fed. R. Crim. P.* 24(c) provides that once a case is submitted to the jury alternates must be discharged. It is significant that a proposal had been made that the federal rules be amended to allow for a substitution procedure. However, after being submitted to the Supreme Court for comment, the Court questioned the committee as to whether it was satisfied as to the constitutionality of such provision, and the proposal was withdrawn. See, Orfield, "Trial Jurors in Federal Criminal Cases," 29 *F. R. D.* 43, 46 (1962).

others involved in a protracted trial. The constitutionality of the statute was upheld in *State v. Dolbow*, 117 *N. J. L.* 560, 564 (E. & A. 1937), appeal dismissed 301 *U. S.* 669, 57 *S. Ct.* 943, 81 *L. Ed.* 1334 (1937). Until the jury retires to deliberate on its verdict, if there is good cause to excuse a juror, no statute or rule of law is violated, nor is there any conceivable prejudice to a defendant or the State. However, once the jury begins deliberations and an alternate is substituted the possibilities of prejudice resulting are unlimited. As an example, we need consider only what happened in the instant case in addition to the deficiency found to exist by Judge Conford.

Following the trial judge's charge, the 12 jurors were chosen (improperly, but not prejudicially, as indicated in the majority opinion), sworn and retired to deliberate. The trial judge then had two court attendants sworn to guard the four alternates. He explained to the alternates why they were to be sequestered and said "* * * we will take you upstairs and we will have to keep you up there without talking to anyone until the deliberations have been concluded."[4] Significantly, he failed to instruct them not to discuss the case with each other. We would be naive to believe that at a time when the alternates thought they probably would have no further connection with the case they did not express their personal views on the guilt or innocence of defendant and the possible verdict to be rendered. Therefore, I am convinced that when the alternate became a member of the panel of 12, he brought with him the views of the other three alternates. As indicated, we have no way of knowing what went on during the original jury's deliberations, or what was discussed when the alternate joined them. It is the danger of contamination which must be guarded against and which is to be condemned

---

[4] At the outset of the trial, before any testimony was taken, the trial judge instructed the jury not to discuss the testimony among themselves until after he had charged the jury.

as a denial of due process when we are required to speculate if a verdict is tainted. In my view, defendant in this case was tried by either 13 or 16 jurors contrary to *N. J. Const.* (1947), Art. 1, par. 9 and *R.* 1:8-2(d). When an individual's freedom is at stake, a court should not be required to speculate whether he received a fair trial in accordance with law and due process.

Another problem which deserves our considered judgment, since the issue involved is novel, is whether the circumstances surrounding the trial judge's decision to excuse the juror were sufficiently compelling to justify his action. The only colloquy that ensued between the juror who was excused and the trial judge follows:

JUROR NUMBER 11: Question. May I be dismissed from this jury because I appear to be too nervous and nervousness is affecting my judgment of this case? I want to be honest. Except I am nervous. I have to be honest. It is affecting my judgment and if you don't mind, I would like to be replaced with someone.
THE COURT: Don't you think you can render a fair verdict?
JUROR NUMBER 11: No, I don't.

When a juror seeks to be excused after deliberations have begun, it is the trial judge's duty to exert every reasonable effort to avoid the consequences that would necessarily flow from a granting of the request. The trial judge must make careful inquiry into the substance of the request. Admittedly, he must approach the issue with extreme caution and delicacy to avoid a mistrial or tainting the jury's deliberations. Normally, such inquiry would be made out of the jury's presence, but in the presence of all counsel and defendant. See the discussion concerning the extent to which the trial judge should examine the juror's reasons for wanting to be excused. *State v. Trent,* 157 *N. J. Super.* 231 (App. Div. 1978). Here, the juror's reason for asking to be excused was "* * * I appear to be too nervous and nervousness is affecting my judgment * * * and if you don't mind, I would like to be replaced

with someone." The trial judge asked only one question before excusing him "Don't you think you can render a fair verdict?"

It is my view when the request was made compelling circumstances did not exist for excusing the juror, and that defense counsel's motion for a mistrial, based on the existing record, should have been granted. I assume every juror in a murder case is concerned and nervous to some degree, but that does not warrant excusing him from his sworn duty. Should we be compelled to speculate why and to what extent this juror suddenly became nervous after a four-day trial and about 90 minutes of deliberation? Must a trial judge accept his bald statement that he is nervous and wants to be replaced? No judge should have to do so because of the many speculative reasons that come quickly to mind. As an example only, he alone may have wanted to acquit or convict defendant and his fellow jurors took a contrary position and were pressuring him to adopt their views. Certainly, if this were the fact, excusing him would be unwarranted. Or, could it be one of the deficiencies of R. 1:8-2(d) that a juror, knowing that alternates were waiting in the wings, took what he considered an easy way out? Or, perhaps, the other 11 jurors suggested it to him. In short, since we must speculate as to his reason, the trial judge's action in excusing him under the existing circumstances was a mistaken exercise of discretion.

Finally, I am unable to agree that error did not result from the failure of the alternate juror to hear the supplemental charge. The majority admits the alternate jurors should have been brought into the courtroom to hear the supplemental charge, but decide that no prejudice resulted.

The difference between first and second degree murder, and the elements to be proven in connection therewith, are probably the most important parts of the charge. In reality, it is the most difficult part of the charge for the jury to understand. The trial judge in charging the jury on this subject utilized verbatim the suggested charge prepared by

the Supreme Court's Committee on Model Jury Charges. The transcript of this portion of the charge consists of six typewritten pages in the record. In contrast, in answering the jury's inquiry that he "clarify the definition between first and second degree murder" he merely excerpted portions of his original charge (about two and one-half transcribed pages) and suggested if they needed additional clarification to ask for it.

I know of no case in the annals of the law, nor have any been brought to my attention, where absent a waiver a verdict was held valid if all the jurors rendering the verdict did not hear the trial judge's entire instructions. No sound reason is presented which should impel us to adopt a new principle of law, and discard what has been a principle of justice so deeply rooted as to be deemed a fundamental and required practice, when to do so is based on pure conjecture. The trial judge's deliberate failure to repeat his supplemental charge to the alternate, in the face of the requirement of R. 1:8–2(d), defense counsel's request for him to do so and the denial of the motion for a mistrial, deprived defendant of a fair trial and due process of law.

Accordingly, for the reasons expressed, I would reverse the conviction and order a new trial.

PASHMAN, J., dissenting and concurring in part. I am convinced that this defendant's confession was involuntary and join in Point I of Judge Conford's dissent.

I conclude that R. 1:8–2 (d), providing for the substitution of an alternate juror for a regular juror after deliberations have begun, is constitutionally valid on its face. So long as the members of the original jury are specifically instructed to begin deliberations anew when a substitution is made, the defendant is not prejudiced, and the spectre of a mistrial at such a late stage is avoided. It should be noted that the judicial economies made possible by this procedure will redound to the benefit of numerous defendants whose cases will not be put off by the unnecessary

retrial of a time-consuming case. Thus, I concur in the conclusion of the majority, see *ante* at 405-406 on this point.

However, I am unable to accept the premise that the failure of the alternate juror to hear a recharge differentiating first and second degree murder was harmless. All jurors — both deliberating and alternate — must hear the same orders and instructions of the court. I join in Judge Halpern's dissent, see *ante* at 431-432 on this point.

*For reversal and reinstatement of conviction*—Justices SULLIVAN, CLIFFORD, SCHREIBER and HANDLER—4.

*For affirmance*—Justice PASHMAN and Judges CONFORD and HALPERN—3.