**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3029-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JERRY M. LOATMAN, JR.,

    Defendant-Appellant.

_____

Submitted February 9, 2021 – Decided March 2, 2021

Before Judges Haas and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Accusation No. 08-12-0070.

Hegge & Confusione, LLC, attorneys for appellant (Michael Confusione, of counsel and on the brief).

John T. Lenahan, Salem County Prosecutor, attorney for respondent (David M. Galemba, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jerry M. Loatman, Jr. appeals from a March 2, 2018 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm.

Defendant was charged with first-degree murder, N.J.S.A. 2C:11-3(a)(1); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a)(1), 2C:11-3(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2); first-degree robbery, N.J.S.A. 2C:15-1(a)(1); third-degree theft, N.J.S.A. 2C:20-3(a); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d). He was seventeen years old at the time of his arrest.

Codefendant Brooks Harris hired defendant and codefendant Lee Williams to kill Jeremy Huff, with whom Harris' wife had a relationship. On August 13, 2008, Harris drove defendant and Williams to Huff's residence and advised them how to approach and where to enter the residence. Once inside, the pair entered Huff's bedroom, stabbed him thirty-eight times, and left. Defendant also took a jar of change as he exited the residence.

Huff died hours later in emergency surgery, but not before telling a State Trooper and a paramedic who responded to the scene that Harris was the

2

perpetrator. Harris was arrested the following morning and in a recorded interview admitted he hired defendant and Williams to kill Huff.

Defendant was arrested on August 15, 2008. His mother came to the police station and police read defendant his Miranda[1] rights in her presence. Defendant and his mother signed the Miranda warning card and his mother consented verbally and in writing to defendant's interrogation while she waited in the lobby. Defendant's interview was taped and began at 11:45 a.m. and continued uninterrupted until 2:27 p.m. Defendant initially denied going to Huff's home and denied involvement by Williams. As police informed him they had different or more information, he asserted he did not enter the home and only served as the lookout, and he and Williams only intended to beat Huff. Then defendant claimed Williams killed Huff before confessing that both he and Williams committed the murder. Following defendant's interview, he agreed to take a polygraph test and in the course of the test admitted stabbing Huff.

Defendant entered into a negotiated plea and cooperation agreement with the State in which he agreed to testify against Harris and Williams. On December 16, 2008, pursuant to the plea agreement, defendant gave a second recorded statement to investigators in the presence of his counsel providing

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3029-19

more details regarding the crime. On December 18, 2008, defendant waived indictment and pled guilty to first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). The remaining charges were dismissed. At his plea hearing, defendant testified he understood the State was recommending a twenty-five year sentence subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and further acknowledged he would be subject to mandatory fees and restitution as demonstrated by the following colloquy:

> [Defense counsel]: Okay. You understand the State's recommending [twenty-five] years['] incarceration, [you] must do [a] minimum of [eighty-five] percent, [as] we discussed. The mandatory minimum fees, and there would be restitution, [as] we noted. Money that may have been taken, expenses, possibly the funeral cost; you understand that? That you may liable for it?
>
> [Defendant]: Yes.
>
> The Court: Most likely, you will be.
>
> [Defense counsel]: Do you understand that? Questions about that so far?
>
> [Defendant]: No.

Defendant's plea forms were completed consistent with his testimony affirming his knowledge of the plea.

In July 2009, a grand jury returned a sixteen-count indictment against Harris and Williams. In April 2010, defendant testified against Harris. A jury convicted Harris of murder and other offenses.

In 2010, the Salem County Prosecutor's Office learned before Williams was arrested, he went to his godfather's home to advise him authorities were looking for him. His godfather, who was friends with Lloyd Lewis, a Lieutenant in the Lawnside Police Department, brought Williams to the Lawnside Police Department. Lewis later testified in a motion proceeding in Williams' case that he mirandized Williams, who then stated he and "some friends went to a home in Quinton Township . . . that [he] and another gentlemen went into the home, that the other gentleman stabbed someone." When officers from the Salem County Prosecutor's Office arrived to pick up Williams on August 20, 2008, Lewis did not recall if he told them that Williams had given a statement about the murder. The recording of Williams' statement was deleted after forty-five days pursuant to the Lawnside Police Department's customary practice because no one made a request to preserve it.

On January 24, 2012, as Williams' trial approached, defendant's counsel advised the State defendant was refusing to testify against Williams. Therefore, lacking Williams' recorded statement and defendant's testimony, the State

A-3029-19

reached a plea agreement with Williams to serve five years for conspiracy to commit burglary.

On April 17, 2012, defendant was sentenced in accordance with the plea agreement. Relevant to the issues raised on this appeal, the State argued several aggravating factors and mitigating factors ten and twelve. Regarding mitigating factor twelve, the State noted it continued to apply because "[a]lthough[] the defendant didn't completely comply with his cooperation [agreement,] he did, in fact, testify at the trial against . . . Harris." Defense counsel agreed, stating: "As the [p]rosecutor's already said, he did cooperate and testify in one of the trials, which was very helpful in obtaining a conviction. I'd ask the [c]ourt to follow the [p]lea [a]greement." The sentencing judge gave "some weight" to factor twelve, finding although defendant "did not cooperate with the second phase of his cooperation agreement[,] . . . again, having presided over the trial, his testimony in the . . . Harris [case] was extremely . . . essential[] to the conviction that the State obtained in that matter." The judge also signed a restitution order, which defendant consented to, holding defendant and Harris jointly and severally liable for payment of $5000 in fines to the Victims of Crime Compensation Board and $3888 to Huff's estate.

Defendant appealed from his sentence. In February 2013, we affirmed the sentence on our sentencing oral argument calendar.

In April 2017, defendant filed the PCR petition raising claims of ineffective assistance of trial counsel. He argued his attorney failed to file a motion to suppress his taped statement because the police excluded his mother from the interrogation and extracted an involuntary confession. He asserted counsel failed to argue mitigating factor twelve at the sentencing and failed to argue against restitution. He further argued his plea was neither knowing nor voluntary because counsel failed to inform him about Williams' statement prior to his plea.

The PCR judge made comprehensive oral and written findings rejecting defendant's PCR claims. The judge recounted her review of defendant's interview in detail and concluded his statement "was made knowingly, intelligently and voluntarily." She stated:

> Defendant was [seventeen] years old at the time and in the ninth grade. However, he displayed awareness and maturity beyond what might be expected of a person in the ninth grade. He asked questions, and he sought explanations when needed. He understood the seriousness of his situation ("I'm gonna be doin' a lot of time.") but did not verbalize any undue distress about his situation. He was questioned for about four hours. There is no evidence of physical punishment or mental exhaustion. Defendant had four prior contacts

A-3029-19

with the criminal justice system. He was advised of his constitutional rights in the presence of his mother and voluntarily waived them. His mother gave permission to the detectives to question her son outside of her presence. She waited in the waiting area. There is no evidence to support a finding that she was excluded from the interrogation room. When [d]efendant ultimately asked to talk to her, he was allowed to do so.

Further, there is no indication that [d]efendant's will was overborn[e] by any means during the interrogation. The fact that the police told [d]efendant he was lying is insufficient to support a finding that [d]efendant's statement was not made voluntarily. Likewise, the fact that the detectives said they would "make a couple phone calls" would not undermine the voluntariness of the statement. Notably, the detective told [d]efendant[:] "[F]or me to tell you exactly what's gonna happen, I don't know." Thus, the court cannot find that [d]efendant was promised anything in exchange for providing a statement.

The judge concluded defendant was not prejudiced by counsel's performance because a suppression motion would have been unsuccessful.

The judge also rejected defendant's assertion his attorney did not argue mitigating factor twelve. She noted although the attorney did not enumerate the factor, counsel's comment during the sentencing that "[a]s the [p]rosecutor's already said, [defendant] did cooperate and testify in one of the trials, which was very helpful in obtaining the conviction[]" was clearly a request of

the court to consider [d]efendant's cooperation in the case[.] . . . It is not unreasonable to conclude [the

sentencing judge] understood counsel's reference to cooperation to be a reference to mitigating factor [twelve].

Furthermore, [the sentencing judge] found that mitigating factor [twelve] . . . was applicable. The [j]udge stated that the plea agreement called for [d]efendant to testify against . . . Harris and . . . Williams. . . . The [j]udge gave some weight to factor [twelve] notwithstanding the fact that [d]efendant did not fully comply with the cooperation requirement of the plea agreement.

. . . Defendant received the benefit of the plea agreement, which called for a twenty-five year term in New Jersey State Prison subject to [NERA], in exchange for "truthful testimony against any and all codefendants if requested," despite his failure to fully comply with his end of the bargain.

The judge rejected defendant's argument his plea was not knowing because he was unaware of Williams' statement. The judge stated:

[N]either the Salem County Prosecutor[']s Office nor defense counsel were aware at the time of [d]efendant's plea that Williams had made statements to a Lawnside police officer implicating [d]efendant in the murder. Consequently, the plea agreement did not contain a condition that [d]efendant would only be required to testify against Williams if Williams implicated [d]efendant in some fashion. Likewise, the plea agreement did not excuse [d]efendant from testifying against Williams in the event that Williams did not implicate him in the crime. The plea agreement is clear: "Truthful testimony against any and all codefendants if requested" was required in exchange for the State's

recommendation of a sentence of [twenty-five] years subject to NERA.

Defendant understood his obligation under the plea agreement as is evidence[d] by the following statements . . . from [d]efendant's plea hearing . . . :

Court: . . . You understand it may be required for you to give truthful testimony, if that's necessary, with the co-defendants; you're aware of this?

Defendant: Yes.

Court: Okay. And, essentially, you've done that in another form, but it may be required in court, as well; you understand that?

Defendant: (No verbal response given, defendant nodded head in the affirmative).

Court: . . . And, . . . you understand that there may come a time, in trials, perhaps, or in some other [c]ourt proceeding, where you would be required to testify, under oath, against the persons that were also involved in this matter? You appreciate that?

Defendant: Yes.

Court: And, that that would continue on until such time as their cases are resolved, whether by trial, or maybe they'll be [p]lea [a]greements with them. We don't know that yet. But, you may be called upon to take this stand and raise your right hand,

10

and to testify truthfully. Any problem understanding that?

Defendant: No.

This record indicates that [d]efendant understood that he was required to testify against Williams, regardless of what Williams might do. Defendant was not relieved of his obligation simply because he perceived that Williams had not implicated him in the murder. He has failed to demonstrate that his choice not to testify was the result of ineffective assistance of counsel.

. . . .

As noted earlier, it appears that neither the prosecutor nor defense counsel were aware of Williams['] conversation with Lawnside police until sometime in 2010 – long after [d]efendant's plea. . . . Defendant has failed to explain how his lack of knowledge of this statement undermines the validity of his plea.

The PCR judge rejected defendant's arguments relating to the restitution noting he "signed a consent order agreeing to pay this amount of restitution" and confirmed he "understood this require[ment] as is evident from his testimony during the plea." The judge concluded

[d]efendant acknowledged both the loss sustained and his ability to pay over time by consenting to the amounts requested. He did not challenge the imposition of restitution at the time of his plea or sentence. It appears he did not challenge it on appeal. He now alleges that it is a hardship for him to pay

11

restitution because any amounts deposited in his account are greatly depleted by withdrawals to pay restitution. He has not provided any information as to how much he has paid towards his obligation or how much is taken from his account on a monthly basis to make the payment toward restitution. He has not demonstrated that counsel was ineffective for not objecting to the imposition of restitution at the time of sentencing.

The judge denied the PCR petition because defendant did not demonstrate a prima facie case of ineffective assistance of counsel and a hearing would not aid the judge to decide the matter.

Defendant raises the following point on appeal:

The trial court erred in denying defendant's petition for post-conviction relief without an evidentiary hearing . . . .

A defendant asserting a claim of ineffective assistance of counsel must satisfy the two-part test established in Strickland v. Washington, 466 U.S. 668, 687 (1984), and later adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987). Under that test, a defendant first "must show that counsel's performance was deficient." Strickland, 466 U.S. at 687. The defendant must establish that the attorney's performance "fell below an objective standard of reasonableness" and that "counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687-88.

The defendant also must show "the deficient performance prejudiced the defense." Id. at 687. To establish prejudice, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the matter. Id. at 694.

An evidentiary hearing on a PCR petition is required only when the defendant presents a prima facie case for relief, the court determines that there are issues of material fact that cannot be resolved by reference to the existing record, and the court determines that an evidentiary hearing is required to resolve the issues raised. State v. Porter, 216 N.J. 343, 354 (2013) (citing R. 3:22-10(b)). "A prima facie case is established when a defendant demonstrates 'a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits.'" Id. at 355 (quoting R. 3:22-10(b)).

In State v. Presha, our Supreme Court stated:

> [F]or a confession to be admissible as evidence, prosecutors must prove beyond a reasonable doubt that

the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances. State v. Burris, 145 N.J. 509, 534 (1996); State v. Kelly, 61 N.J. 283, 294 (1972).

At the root of the inquiry is whether a suspect's will has been overborne by police conduct. In determining whether a suspect's confession is the product of free will, courts traditionally assess the totality of circumstances surrounding the arrest and interrogation, including such factors as "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." State v. Miller, 76 N.J. 392, 402 (1978). Additionally, "[a] suspect's previous encounters with the law has been mentioned as [a] relevant factor." Ibid. We reaffirm those factors as germane to an evaluation of the admissibility of either adult or juvenile confessions.

[163 N.J. 304, 313 (2000) (alterations in original).]

Defendant reasserts the arguments raised before the PCR judge. Defendant also points to our decision on an appeal from the denial of a PCR petition in Harris' case in which we remanded for an evidentiary hearing on whether Harris' statement to police should have been suppressed and argues he is entitled to a hearing as well. State v. Harris, No. A-3021-17 (App. Div. Nov. 27, 2019) (slip op. at 1). He posits that he "was only [seventeen] years old when he was interrogated[, h]is parents were not present[, and t]he primary culprit[,]

14

. . . Harris, had already given a statement to officers, months before, pointing to [defendant] as a perpetrator." He asserts "[t]hese facts warranted an evidentiary hearing and exploration of defense counsel's failure to pursue a motion to suppress [defendant's] statements before advising the juvenile defendant to enter a guilty plea subjecting him to [twenty-five] years in prison."

The outcome of Harris' PCR case has no bearing on defendant's matter because the facts are different. We remanded Harris' case for an evidentiary hearing because he alleged that on a

> break during his recorded statements to the detectives, . . . detectives interrogated him, without being recorded, in a different room. He contend[ed] that representations of the detectives during this alleged off-the-record interrogation made his second statement involuntary. As such, he argue[d] that his trial counsel should have filed a motion to suppress the statement, and the trial court should thereafter have conducted a Rule 104 hearing as to its voluntariness.
>
> [Id. at 21.]

We noted the detectives in Harris' case repeatedly told him Huff was alive when he had in fact died and told Harris they would speak with Huff if Harris did not confess. Id. at 26-28. We stated:

> If, in fact, the police had misled defendant about whether Huff was still alive, or failed to correct a misapprehension about his status, defendant might have worried that Huff would have testified against him at a

future trial. Such a concern might have affected his willingness to be more forthcoming and cooperative with the police.

[Id. at 28.]

We also noted detectives also attempted to have Harris confess by appealing to Harris' desire to raise his children. Ibid.

Additionally, we found the timing of Harris' interrogation raised questions. We noted Harris

> was taken into custody at his mother's home at some time in the morning after Huff's death. The first recording starts at 5:22 a.m. and the second recording ends at 7:50 a.m. It is unclear if or how much defendant slept before being detained. He was at a bar the night before, and apparently went to his mother's home after police responded there and she called him. Based on defendant's first statement to the detectives, it appears he went to his mother's home straight from the bar.
>
> [Id. at 29.]

We concluded Harris:

> has not presented fanciful concerns of involuntariness. If his contentions are truthful, the police in this case repeatedly cajoled and misled him into admitting in the second interview that he had done far more than request to have Huff "lumped up" but, more egregiously, to have Huff killed. Such a powerful recorded admission of guilt — which the jury asked to have replayed before returning their verdict — may have tipped the balance in deliberations, although the strength the State's other

16

proofs (such as Loatman's testimony) surely would also be a factor.

[Id. at 33.]

None of the concerns raised in Harris' case apply here.  In addition to defendant and his mother consenting to the interrogation, there was no break or unrecorded portion of defendant's interrogation.  Police interrogated defendant at a reasonable hour, beginning in mid-morning and ending in early afternoon.  Police did not mislead defendant about Huff's status or attempt to cajole defendant by appealing to his desire to see his family again.

The record also shows the PCR judge appropriately applied the Presha factors in concluding defendant's confession was voluntary.  For these reasons, the PCR judge correctly found there were no facts warranting a hearing and trial counsel did not err by failing to file a motion to suppress defendant's statement because such a motion would not have been successful.

Finally, defendant argues

> [a]n evidentiary hearing was warranted . . . on [his] claim that his lawyers were "ineffective for failing to ask for a lighter sentence because of significant [mitigating] [f]actor [twelve]."  As PCR counsel argued, defendant's lawyers did not advise him that the perpetrator, Williams, had already "confessed to the crime" and implicated [defendant].

Defendant argues this resulted in him receiving a much longer and disparate sentence than Williams.

This argument lacks merit, and we affirm substantially for the reasons expressed in the PCR judge's decision. Defendant did not receive a disparate sentence. Rather, the record shows Williams received a lesser sentence due to defendant's refusal to testify against him, thereby depriving the State of its ability to prosecute Williams on the more serious charges. Regardless, defendant received the full benefit of his plea agreement and his counsel was not ineffective as a result.

To the extent we have not addressed an argument raised by defendant, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3029-19