# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2106-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

D.C.J.,

     Defendant-Appellant.

_____

> Argued November 14, 2023 – Decided January 4, 2024
>
> Before Judges Haas and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 19-03-0602.
>
> Morgan A. Birck, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Morgan A. Birck, of counsel and on the brief).
>
> Linda Anne Shashoua argued the cause for respondent (William Edward Reynolds, Atlantic County Prosecutor, attorney; Katrina Marie Koerner, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following the denial of his motion to suppress, defendant D.C.J. pled guilty to one count of first degree aggravated sexual assault against a victim under the age of thirteen in violation of N.J.S.A. 2C:14-2(a)(1), and was sentenced in accordance with the plea agreement to a fifteen-year custodial sentence with fifteen years of parole ineligibility. He appeals from the court's order denying his motion to suppress his statements made to police. After considering all of his contentions in context of the record and applicable law, we are satisfied there was sufficient credible evidence supporting the court's finding the State proved beyond a reasonable doubt defendant knowingly, intelligently, and voluntarily waived his Miranda[1] rights. We accordingly affirm.

I.

The events leading to defendant's arrest and conviction were described in detail at the suppression hearing in which Detective Michael Peterson, an Atlantic County Prosecutor's Officer detective with eight years of experience, testified on behalf of the State, and David F. Bogacki, Ph.D., A.B.P.P., testified for the defense as an expert in forensic psychology. At the time of the investigation, Detective Peterson was assigned to the Special Victims Unit and

---

[1] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

was involved in the investigation of the sexual assault of J.J.,[2] defendant's half-brother. According to Detective Peterson, that investigation led police to believe defendant was the "accused party."

The police accordingly went to defendant's residence in Atlantic City. After they informed him they were conducting a criminal investigation involving J.J., they requested he consent to an interview. Defendant agreed and accompanied Detective Peterson and Sergeant Lynn Dougherty to the prosecutor's office.

Defendant's interview with police was video recorded, provided to the court, and played, in part, at the suppression hearing. Portions of the interview were also read into the record. At the outset of the interview, Detective Peterson provided defendant with a card listing his <u>Miranda</u> rights. Detective Peterson read from an identical card and informed defendant of these rights and confirmed he understood each of them.

At one point during this process, defendant appeared to be confused, as evidenced by the following colloquy:

> Detective Peterson: All right. I'm going to read your rights to you now. I'm going to read them from this card. All right. We have the same card. So whatever I say on here, it's going to be the same on there.

---

[2] We use initials to protect the victim's privacy. <u>R.</u> 1:38-3(c)(12).

. . . .

Detective Peterson: Do you understand each of these rights?

Defendant: Yes.

Detective Peterson: Do you desire to waive these rights and answer questions?

Defendant: No.

Detective Peterson: No?

Defendant: No.

Detective Peterson: You don't want to talk to us today?

Defendant: Oh. Oh, I do. Oh, so -- so that's it. Oh, oh, oh, okay.

Detective Peterson: Yeah.

Defendant: Can I –

Detective Peterson: So, --

Defendant: Okay.

Detective Peterson: -- essentially, I'll -- I'll repeat it and then I'll -- I'll tell you what it means.

Defendant: Oh, okay.

Detective Peterson: Do you desire to waive these rights and answer questions? And, basically, that's -- that's saying, okay, you understand but you -- you don't have

4

to -- you don't have to talk to us if you don't want to. You can start talking and then stop --

Defendant: Okay.

Detective Peterson: -- or you can have an attorney here if you want one or you can -- you know, you can have an attorney before or during questioning.

Defendant: I don't see no need for that.

Detective Peterson: Okay. So did you want to talk to us today without an attorney?

Defendant: Yeah. Yeah, sure.

Detective Peterson: Okay. That's the -- That's essentially what number [seven's] asking.

Defendant: Oh, okay.

. . . .

Detective Peterson: I know the wording sometimes -- like the wording on the -- the questions.

Defendant: Oh. It was confusing.

Sergeant Dougherty: It is, yeah.

Defendant: (Laughs.)

Throughout the remainder of the interview, defendant did not ask about, or invoke, his Miranda rights. Nor did he request to stop the questioning or indicate a desire to end the interrogation. As to the explanation of defendant's

5                                                    A-2106-21

waiver of his rights, Detective Peterson testified he believed it was necessary because when initially asked if he wished to waive his rights, defendant responded "no," which Detective Peterson believed was contrary to defendant's intention as he willingly came to the interview.

After defendant signed the <u>Miranda</u> card, Detective Peterson began the substantive portion of the interview, and, approximately thirty-two minutes into that interview, asked defendant why he stopped living with his father. Defendant answered, "out of nowhere he just told me to go home and then that's when . . . his friend called me he's like . . . we think you molested your brother." Defendant stated he denied the accusation and said he found it "really offensive."

A few minutes later, Detective Peterson told defendant the investigation began "when . . . [J.J.] said something to his mom and then his mom called your dad and then we got involved." Specifically, Detective Peterson stated:

> [J.J.] said that night . . . he was in bed with you . . . and that's when it happened and he said that . . . you guys were in bed together laying next to each other and at some point while . . . you guys were laying there you put your penis in his butt.

After hearing that information, defendant did not initially confess nor did he provide any incriminating statements. In fact, he denied ever being accused

6

of similar acts when Detective Peterson asked defendant about two prior incidents involving defendant's cousin and brother. Specifically, defendant denied assaulting his cousin and stated, "they told me I was good and I had to pay my fines," and said he was on probation for a year. Defendant also denied assaulting his brother when defendant was thirteen or fourteen years old, but stated his brother "showed me his stuff." When Detective Peterson directly asked him, "did you try or actually put your penis in [J.J.]'s butt," and "[d]id you ever put your mouth on [J.J]'s penis," defendant replied he did not.

Approximately one hour and fifteen minutes into the interview the following exchange took place between Detective Peterson and defendant:

> Detective Peterson: . . . [L]isten, this is all we deal with right? We don't deal with robberies or drugs or murders or anything like that. This is all we deal with . . . So we're the ones, since we see it so often . . . we understand what it is. <u>We don't just put stereotypes on people and say, well, this happened, you know, they touch little kids and they're automatically a bad person.</u> We see it so much that we understand why people do certain things. <u>So what I'm telling you is if you didn't do what [J.J.] said you did, I'm here to help clear your name. Right? I'm here to say D.C.J. didn't do this, but if something did happen, I'm here to help you explain why it happened, okay?</u>
>
> Defendant: Put me where I need to be. I mean I just said that.

Detective Peterson: What do you mean put you where you need to be?

Defendant: I mean like if somebody, if that ever happened, like you feel me . . . like I know that's a lie, but I'm just saying like put it like in a different perspective. If somebody, like if I said, okay, somebody did something like that . . . they happen to find out . . . it was them . . . I mean he'll get like locked up and put him where he's supposed to be or should not be. I mean that.

Detective Peterson: <u>Well, people that we talk to . . . where they're supposed to be like it's not up to us, but there's help in counseling and therapy for stuff like that. People don't get better in jail</u>. Have you ever been in jail?

Defendant: No, sir . . . I pray, pray, pray.

    . . . .

Detective Peterson: People don't get better in jail . . . That's not who we are as police officers, because we want to help people and before police officers, we're people. We are regular people just like you and your family. <u>We understand that people have issues and that people make mistakes.</u>

    . . . .

<u>[B]ut we're not here to put people in jail</u> and, you know, judge people based off the mistakes that they've made. We have the same emotions and the same feelings that everybody else does, right, and we understand that things happen . . . <u>I'm here trying to talk to you as a person and . . . try to help you explain what happened</u>

right cause that's my job. I have . . . [two] ears for a reason I'm here to listen, you know what I mean?

[Emphasis added.]

Detective Peterson then recounted to defendant J.J.'s allegations and said, "I want you to hear me again I'm here to help you explain what happened but more importantly why it happened." Detective Peterson told defendant, "a bad person is somebody who doesn't care about anybody else, does things for their own gain, and hurts people . . . I'm not getting that from you."

Soon thereafter, Detective Peterson continued his appeal to defendant stating, "you wanted to come with us, you wanted to talk to us, you wanted to help explain what happened." Detective Peterson also told defendant, "you're trying to reconnect with your family, you're trying to get a good job . . . you're not a violent person." Referring to J.J., Detective Peterson said, "I think he was curious, and I think he asked you that night . . . what it was like or asked . . . you to show him what it was like," and "if you wanted to force him or if you wanted to hurt him you could have . . . [b]ut you didn't do that." Defendant replied, "[n]o, I didn't." Detective Peterson continued:

> Detective Peterson: No, you didn't do that . . . I know you're not a bad guy. Like I said bad people hurt people, bad people only care about themselves. I can see you care about your family you[] care about your mom and you[r] dad and your brothers.

9

Defendant: I care about everybody I love . . .

Detective Peterson: You do care about everybody you love and <u>you didn't do it with [J.J.] because you don't love him. You didn't do it because you wanted to hurt him, right, 'cause you could have hurt him but you didn't.</u>

[Emphasis added.]

Detective Peterson told defendant there is help for "urges" defendant may have, and he does not blame defendant "for something you can't even control." Detective Peterson also informed defendant his job is to "help people no matter who they are, no matter what they have done." He said he understands "things happen and it's not by monsters in the dark," but rather "by regular people who need some help." Detective Peterson told defendant he did not think defendant was "out to hurt anybody <u>'cause nobody was hurt</u>." (emphasis added). Detective Peterson then said, "[b]ut . . . something did happen, and we got to start off with that truth so we can start getting better . . . I'm listening."

Defendant then described sexually assaulting J.J. on two occasions and stated, "I did something so wrong." When asked, defendant stated, "I felt disgusting, like I should have never did that. I don't know what was in my head." Defendant also told Detective Peterson, "just put me where I need to be right now."

10

At the conclusion of the interview, defendant wrote an "apology letter" to J.J., at Detective Peterson's suggestion. The letter is two pages long and took defendant over an hour to write. The letter was not included in the record before us.

In a three-count indictment, defendant was charged with third-degree endangering-sexual conduct with a child less than thirteen years of age, in violation of N.J.S.A. 2C:24-4a(1); second-degree sexual assault of a child less than thirteen years of age, in violation of N.J.S.A. 2C:14-2(b); and first-degree aggravated sexual assault of a victim less than thirteen years of age, in violation of N.J.S.A. 2C:14-2(a)(1).

As noted, at the suppression hearing, Dr. Bogacki testified for the defense as an expert in forensic psychology and opined within a degree of reasonable psychological certainty that although defendant was competent to stand trial he was unable to knowingly and intelligently waive his Fifth Amendment rights. In reaching his conclusions, Dr. Bogacki reviewed, among other materials, the Miranda card defendant signed, the apology letter, defendant's educational records, and defendant's interview with police.

Additionally, he evaluated defendant and administered several cognitive tests. Dr. Bogacki concluded defendant "had a mental defect; namely, a specific

learning disability," as he demonstrated "poor attention and concentration; short attention span; [and an] inability to either read, write, [or] spell." He also testified defendant demonstrated "emotional immaturity" and "an acquiescence response set," meaning defendant tends to act knowingly when, in fact, he does not know things, which is consistent with his learning disability.

Dr. Bogacki also evaluated defendant's full-scale IQ and concluded it was sixty-seven, which is "within the mild range of cognitive disability," and in "the first percentile in comparison to same age peers." Dr. Bogacki concluded defendant's reading ability to be at a fourth-grade level and his receptive language ability, that is, the ability to understand words, at the ten-year, nine-month-old level.

With respect to the Miranda card defendant signed during his interview, Dr. Bogacki found defendant "struggled with many of the words." Specifically, Dr. Bogacki read each right to defendant and asked defendant what each meant. Dr. Bogacki recorded the following interaction in his report:

> 1. You have the right to remain silent and refuse to answer any questions. [Defendant's] Response: 'I have the right to stay quiet.'
>
> 2. Anything you say may be used against you in a court of law. [Defendant's] Response: 'Anything I say can be used in court against me.'

3. You have the right to consult with an attorney at any time and have him present before and during questioning. [Defendant's] Response: 'The attorney can be with me during court.' I asked him to read this again. He read the right again, and I asked him to tell me, and he stated that 'my lawyer can be with me when I go to court.'

4. If you cannot afford an attorney, one will be provided if you so desire prior to any questioning. [Defendant's] Response: 'If you do not have the money for a lawyer, they will get one for you before you go to court.'

5. You have the right to stop questioning and you have the right to stop answering questions at any time and have an attorney present. [Defendant's] Response: 'I have a right to stop answering questions.'

6. Do you understand each of these Rights. [Defendant's] Response: 'I understand these Rights.'

7. Do you desire to waive these Rights and answer questions. [Defendant's] Response: 'I don't know.'

Dr. Bogacki concluded, based on his responses, defendant was unable to knowingly waive his rights because he did not understand he could have a lawyer present prior to and during police questioning and because he did not understand right number seven on the Miranda card. Dr. Bogacki opined defendant acquiesced to the police when he signed the Miranda card, but did not understand his rights, as "[t]hat's what people who are low functioning do." Dr. Bogacki explained defendant's fourth-grade reading level was insufficient to

13

understand his rights as "studies on Miranda" suggest an eighth to tenth-grade reading level is required.

With respect to his opinion regarding defendant's competency to stand trial but his inability to knowingly waive his Fifth Amendment rights, Dr. Bogacki noted the two issues are determined by different standards. To determine competency, Dr. Bogacki asked defendant "very basic questions" about the judicial process and defendant "didn't do that well initially." Dr. Bogacki explained he then gave defendant "a brief tutorial," and fifteen minutes later defendant was able to demonstrate sufficiently a basic understanding of the judicial process and an ability to cooperate with counsel.

Dr. Bogacki explained he did not similarly explain Miranda rights to defendant and subsequently test his understanding because he did not want to "poison" any future evaluation of defendant with respect to that issue. Addressing defendant's understanding of Detective Peterson's explanation of right number seven on the Miranda card, Dr. Bogacki stated, "the only way to really understand whether somebody knows something is not to just ask them to answer in the affirmative, but to say . . . tell me what you understand."

Dr. Bogacki did not testify as to the impact, if any, of Detective Peterson's statements regarding counseling, therapy, and Detective Peterson's ability to

14

help defendant. He did note in his report, however, "the tone of the investigator's interaction with [defendant] reflected the investigator wanting to help him and that he may have misinterpreted the statement of the investigator." Dr. Bogacki's report acknowledged "[t]here was no indication of coercion by the police, and his statement appeared to be voluntary."

The court denied defendant's motion and issued an accompanying fourteen-page written opinion. The court found Dr. Bogacki to be credible but determined certain of his substantive opinions unpersuasive. The court specifically found, contrary to D. Bogacki's opinion, "[i]t appears that this particular [d]efendant, while low functioning, will not simply 'acquiesce' because he is low functioning . . ." As to defendant's answer to right number seven on the Miranda card, the court determined, "while it is unclear as to how [d]efendant interpreted that question in his mind, he did not simply 'acquiesce,' . . . [he] said no twice."

The court next noted defendant was competent to stand trial based on Dr. Bogacki's "brief tutorial" of the judicial system and, while recognizing the different standards, likened that process to Detective Peterson's explanation of defendant's Miranda rights. Specifically, the court stated, "Detective Peterson recognized at this point [d]efendant appeared to be confused as to question

15

seven, explained [it] in basic terms so [d]efendant could understand, and [d]efendant then agreed to speak to law enforcement."

The court also disagreed with Dr. Bogacki's conclusion that defendant's answer to right number three on the <u>Miranda</u> card displayed a misunderstanding of the word "consult." The court found because Dr. Bogacki testified defendant was able to understand all words on the <u>Miranda</u> card other than "waive" and "consult," it was "not satisfied based upon the testimony of the expert and based upon the interview conducted that [d]efendant does not understand the words 'before or during questioning.'"

Further, the court noted when Detective Peterson explained right number seven to defendant, he stated defendant could have an attorney present at that time if he wished, and defendant responded it was not necessary. The court also rejected defendant's argument the length of time taken to write the apology letter was "evidence of his mental defects," and further explained it would not "speculate as to the possible reasons [d]efendant took the length of time he did" to write the letter.

The court accepted Dr. Bogacki's finding defendant's IQ is sixty-seven, which placed him in the first percentile compared to his same age peers and within the mild range of cognitive disability. The court noted, however, in

16

considering the totality of the circumstances, defendant was twenty-one years old at the time of the interview, was a high school graduate, had been previously employed and, at the time of the interview, was seeking employment. The court further found defendant willingly accompanied officers to the prosecutor's office after being told about the investigation, was not a victim of physical punishment or mental exhaustion, and was not subjected to a lengthy detention as questioning lasted approximately one hour and forty-five minutes. The court also found defendant was conversational and appeared to follow the discussion with police.

Accordingly, the court concluded the State met its burden and proved beyond a reasonable doubt defendant's statements followed a knowing, intelligent, and voluntary waiver of rights. The court noted the interrogation was indeed custodial and the video recording made it clear defendant did not invoke his right to remain silent. The court acknowledged "[t]here was a brief period of confusion as to question seven" on the Miranda card, but "Detective Peterson clarified any ambiguity as to [d]efendant's wish to waive." The court concluded, considering the totality of the circumstances, Detective Peterson reasonably interpreted defendant's words and behaviors when he spoke with officers and waived his rights.

The court also rejected defendant's reliance on State v. A.G.D., 178 N.J. 56, 58-59 (2003), State v. O'Neill, 193 N.J. 148 (2007), and State v. Sims, 466 N.J. Super. 346 (App. Div. 2021).[3] The court first noted, unlike in O'Neill, which held officers' "question-first, warn later" interrogation violated defendant's privilege against self-incrimination, here defendant was read his Miranda rights at the outset of the interrogation. Next, the court stated although the Sims court held to obtain a valid waiver, police must first inform an arrestee of the specific charges being filed, defendant was not arrested, and police did not have an arrest warrant. As the court explained, "had defendant not confessed, he would have been released."

The court also declined to extend the holding of A.G.D. and concluded defendant's "status as a suspect, even if he was the only suspect, does not meet the standard of alerting [d]efendant of his status or the possible consequences of every charge against him should he be charged and convicted as the guilty party." Defendant was later sentenced as noted and this appeal followed in which defendant raises the following points:

> I. THE STATEMENT OF DEFENDANT SHOULD HAVE BEEN SUPPRESSED

---

[3] At the time of the suppression hearing, the Supreme Court had not yet decided Sims, 250 N.J. 189 (2022). As such, the parties and motion court considered our decision in Sims, 466 N.J. Super. 346 (App. Div. 2021).

18

BECAUSE HE DID NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE HIS RIGHT AGAINST SELF-INCRIMINATION, NOR WERE THE STATEMENTS KNOWING, INTELLIGENT, OR VOLUNTARY.

A. D.C.J. could not knowingly and intelligently waive his <u>Miranda</u> rights without knowing that officers had obtained and executed a search warrant for his property.

B. The State failed to prove beyond a reasonable doubt that under the totality of the circumstances, D.C.J.'s waiver of rights and subsequent statements were knowing, intelligent, and voluntary.

1. D.C.J.'s waiver of his rights was not knowing, intelligent, and voluntary.

2. D.C.J.'s statement was not knowing, intelligent, and voluntary.

In Point I.A., defendant contends the trial court erred in denying his suppression motion because prior to his waiver, the police failed to inform him of either his half-brother's sexual assault allegation, or the search warrant issued and executed for his backpack stemming from that accusation. Relying on <u>State v. Nyhammer</u>, 197 N.J. 383 (2009), defendant asserts police were required to

inform him of the search warrant as its issuance was a bright line step in the investigation, at which point, he was no longer a suspect, "but the target of law enforcement and judicial action," requiring police to inform him of such. Defendant also again relies on A.G.D., 178 N.J. at 58-59, and contends his waiver was invalid because he did not have "critically important information" when he waived his rights, specifically, that a judge found probable cause to issue a search warrant.

Defendant further maintains speaking to police about a sexual assault he was accused of, and in which a search warrant has been issued, is materially different than speaking to police about a criminal investigation involving his brother, which is how Detective Peterson described the situation at defendant's house. Thus, relying on State v. Vincenty, 237 N.J. 122 (2019), defendant contends, the police were obligated to inform him of "the nature of the crime being investigated" as it "is critical to a valid waiver," and by not advising defendant of the nature of the investigation and the associated search warrant, "the police deprived him of necessary information and thereby obtained an invalid waiver of rights."

Defendant also argues a search warrant for defendant's backpack is akin to an arrest warrant because "government officials had gone to a judge with what

they believed was probable cause that defendant committed sexual assault, and a judge had authorized an intrusion on [defendant's] privacy based on that probable cause." Defendant maintains the fact the State obtained a search warrant elevated him from a mere suspect, and was thus crucial knowledge, without which, he could not have made a valid waiver of his Miranda rights. We disagree with all these arguments.

## II.

We begin our discussion by identifying the standard of review that guides our analysis. In reviewing a motion to suppress, we defer to the factual and credibility findings of the trial court, "so long as those findings are supported by sufficient credible evidence in the record." State v. Coles, 218 N.J. 322, 342 (2014) (quoting State v. Hinton, 216 N.J. 211, 228 (2013)). Deference is afforded "because the 'findings of the trial [court] . . . are substantially influenced by [its] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Reece, 222 N.J. 154, 166 (2015) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)).

"A trial court's interpretation of the law, however, and the consequences that flow from established facts are not entitled to special deference." State v. Hubbard, 222 N.J. 249, 263 (2015) (citing State v. Gandhi, 201 N.J. 161, 176

21

(2010)). "A trial court's legal conclusions are reviewed de novo." Ibid. (citing Gandhi, 201 N.J. at 176).

A defendant's waiver of his rights against self-incrimination is invalid if police did not "inform him that a criminal complaint or arrest warrant has been filed or issued against him and he otherwise does not know that fact." A.G.D., 178 N.J. at 58-59. When an arrest warrant has been issued, officers "must make a simple declaratory statement at the outset of an interrogation that informs a defendant of the essence of the charges filed." Vincenty, 237 N.J. at 134.

In A.G.D., police asked defendant to accompany them to the prosecutor's office for questioning regarding sexual abuse allegations but did not specify the charges or inform defendant of the arrest warrant already issued. 178 N.J. at 59. The court stated the government's failure to inform a suspect a criminal complaint or arrest warrant has been filed or issued "deprives that person of information indispensable to a knowing and intelligent waiver of rights." Id. at 68. "Without advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission." Ibid.

When neither a complaint nor an arrest warrant has been issued, however, police are not required to inform an arrestee of what charges may be faced prior to conducting an interrogation. Sims, 250 N.J. at 217. In Sims, the Supreme Court declined to adopt "a new rule requiring police officers, prior to interrogation, to inform an arrestee of the charges that will be filed against him, even when no complaint or arrest warrant has been issued identifying those charges." Id. at 197.

In that case, the police arrested defendant prior to the issuance of a complaint or filing of formal charges. Id. at 199. The defendant waived his Miranda rights, and after a two-hour interview, gave a statement, and was subsequently indicted for first-degree attempted murder. Id. at 199. The trial court denied defendant's motion to suppress his statements, and we reversed. Id. at 200, 204. In doing so, we explained A.G.D. and Vincenty required police to inform an arrestee of the "actual" and "specific" charges faced, even if formal charges have not yet been filed. Id. at 205.

The Supreme Court reversed our decision and found the defendant's waiver valid noting, the "expansion of the rule stated in A.G.D. unwarranted and impractical." Id. at 214. As such, the court rejected a bright-line rule "requiring officers to tell an arrestee, not subject to a complaint-warrant or arrest warrant,

what charges he faces before interrogating him" because such a rule "would not comport with our prior precedent." Id. at 216.

Courts recognize the distinction between an individual's suspect status and the issuing of a criminal complaint or warrant. Nyhammer, 197 N.J. at 405. Indeed, "[u]nlike the issuance of a criminal complaint or arrest warrant, suspect status is not an objectively verifiable and discrete fact, but rather an elusive concept that will vary depending on subjective considerations of different police officers." Id. at 405. The failure to disclose suspect status to an individual does not "fall within the limited category of cases in which we have applied a bright-line rule" invalidating waiver, but such failure should be considered as a factor in the totality of the circumstances. Id. at 405, 407.

Here, affording deference to the court's factual findings and reviewing legal conclusions stemming from those facts de novo, we conclude the trial court correctly rejected defendant's argument to extend A.G.D., as its "holding was only to require an interrogee that he or she is the subject of a criminal complaint or arrest warrant." Indeed, the court's conclusion was consistent with Sims, which similarly declined to extend A.G.D. to require police, prior to obtaining a valid waiver, to inform an arrestee of possible charges faced even in the absence of a criminal complaint or arrest warrant. Here, unlike in A.G.D., at the

time of defendant's interrogation, there was no criminal complaint or arrest warrant filed or issued. As such, the court properly found police were not required to inform defendant of his suspect status or possible charges he faced.

III.

In Point I.B., defendant argues the State failed to meet its burden in establishing beyond a reasonable doubt defendant's waiver was knowing, intelligent, and voluntary, and his subsequent statements voluntary. Defendant asserts the totality of the circumstances demonstrate the involuntary nature of his waiver, such as his low IQ and learning disability, the fact the police did not inform him of the specific offenses for which he was being investigated, and police's undermining of his Miranda rights by implying he would not go to jail.

Defendant also relies on Dr. Bogacki's findings and opinions in asserting his waiver was invalid. Specifically, defendant argues his low IQ and fourth-grade reading level prevented his understanding of his Miranda rights, which, according to Dr. Bogacki, requires an eighth-grade reading level. Defendant highlights Dr. Bogacki's finding he did not understand the word "consult" or realize he could have an attorney present prior to and during questioning, thereby not understanding Miranda rights three and four. Additionally,

defendant argues Dr. Bogacki found he did not understand the word "waive," and therefore did not understand number seven on the <u>Miranda</u> card.

With respect to Detective Peterson's explanation of right number seven on the <u>Miranda</u> card, defendant asserts the trial court erred in concluding his initial answer of "no," and after explanation, agreement to waive his rights, demonstrated an understanding of the word "waive." Rather, defendant argues both responses, before and after the explanation, indicate "he was agreeing to do what the officers clearly wanted him to do—speak with police," thereby acquiescing without truly understanding, consistent with his learning disability.

Next, defendant contends the trial court erred in finding he understood the words "before or during questioning," and therefore understood his right to have an attorney present prior to and during questioning. Defendant claims he did not understand operative words, as evidenced by his emphasis on the word "court" with respect to his inability to understand his right to an attorney, and provided answers showing he did not understand he could have an attorney prior to and during questioning, and not just in court.

Defendant also asserts his waiver was invalid because, in addition to his cognitive defects, officers failed to inform him of the true reasons they wanted to speak with him and about the search warrant obtained. Defendant argues this

lack of knowledge, even if alone insufficient to invalidate waiver, is part of the totality of the circumstances in determining the validity of defendant's waiver.

Finally, defendant maintains the trial court erred in finding the police were not obligated to inform defendant of his suspect status because, "[a]lthough there is no bright-line rule regarding suspect status, it is an important part of the totality-of-the-circumstances analysis." Defendant contends the lack of information combined with his cognitive disability is "especially problematic," and ultimately invalidates his waiver. Again, we disagree with all of these arguments.

In Miranda, the United States Supreme Court mandated a suspect subject to a custodial investigation be "adequately and effectively apprised of his rights" against self-incrimination. 384 U.S. at 467. As such, "the Court prescribed a set of warnings that the police must give a suspect before an interrogation begins." State v. L.H., 239 N.J. 22, 42 (2019). In New Jersey, "the State bears the burden of proving beyond a reasonable doubt that a defendant's waiver of his rights was made knowingly, intelligently, and voluntarily." Ibid.

To determine whether a defendant made "a knowing, intelligent, and voluntary waiver" of his Miranda rights, courts consider "the totality of the circumstances surrounding the custodial interrogation based on the fact-based

assessment of the trial court." State v. A.M., 237 N.J. 384, 398 (2019). Factors relevant to this analysis include "the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." State v. Hreha, 217 N.J. 368, 383 (2014) (internal citations omitted). Courts should also consider defendant's previous encounters with law enforcement, the length of time between the administration of Miranda and defendant's statements, and whether police informed the defendant of his suspect status. Ibid.

Notably, a defendant's low IQ is a relevant, but not dispositive consideration in determining whether he understood Miranda rights. Instead, it is "merely a factor in the totality of the circumstances to be considered." State v. Carpenter, 268 N.J. Super. 378, 385 (App. Div. 1993). On this point, we have held there is not a minimum IQ or reading level required to validly waive Miranda. Compare State ex rel. M.P., 476 N.J. Super. 242 (App. Div. 2023) (holding State did not meet its burden in showing juvenile defendant with IQ of seventy-three and fifth-grade reading level properly waived Miranda) with Carpenter, 268 N.J. at 385 (holding defendant's illiteracy and IQ of seventy-one did not render him incapable of validly waiving Miranda); see also State v.

<u>Cabrera</u>, 387 N.J. Super. 81 (App. Div. 2006) (finding a defendant knowingly waived <u>Miranda</u> despite an IQ of sixty-five and sixth-grade education obtained in another country).

Our recent decision in <u>M.P.</u>, 476 N.J. Super. at 242, is instructive. In that case, we reversed a trial court's denial of a motion to suppress, concluding the court's finding M.P., a sixteen-year-old, knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights was not supported by sufficient credible evidence. <u>Id.</u> at 302. In denying the motion, the court "discounted" an expert's "unrebutted testimony concerning M.P.'s intellectual challenges," including a "borderline" IQ of seventy-three, ADHD, history of special education services, and fifth-grade reading level, and concluded the defendant's waiver was valid. <u>Id.</u> at 289, 301. Specifically, the court stated the expert's "opinion is simply not necessary when compared to the video evidence and the detective's testimony." <u>Id.</u> at 289. In reversing, we noted in determining if the State proved its burden, the defendant's "undisputed cognitive limitations and mental conditions must be accounted for in addition to the circumstances outwardly displayed in the video [of the interview]." <u>Id.</u> at 289.

As noted, we are satisfied the court relied on sufficient credible evidence in finding the State met its burden in proving beyond a reasonable doubt

29

defendant's <u>Miranda</u> waiver was knowing, intelligent, and voluntary. The court here, unlike the court in <u>M.P.</u>, did not summarily discount Dr. Bogacki's testimony that established defendant's low IQ and cognitive disabilities and instead rely only on the video recording and transcript of the interview. Rather, the court found the expert's opinions unpersuasive for reasons amply supported in the record. Further, the court made findings contrary to Dr. Bogacki's with respect to defendant's tendency to acquiesce, his ability to understand concepts following an explanation, and his understanding of certain words.

We are also satisfied, under the totality of the circumstances, the court did not err in concluding defendant's waiver was valid despite not being informed of his suspect status or of the search warrant issued. Indeed, as the court noted, "[t]he law does not obligate officers to supply [d]efendant with a flow of information to help him decide whether to waive his rights." The court therefore properly found defendant's suspect status, and the fact a search warrant was issued, did not meet "the standard of alerting [d]efendant of his status or the possible consequences of every charge against him should he be charged and convicted as the guilty party."

Based on those findings, and considering the totality of the circumstances, the court found defendant knowingly waived his <u>Miranda</u> rights. We discern no

reason to disturb those factual findings and the legal conclusions which flow from them. <u>Coles</u>, 218 N.J. at 342.

IV.

In Point I.B., defendant also contends the State failed to prove beyond a reasonable doubt his statements were knowing, intelligent, and voluntary because Detective Peterson impermissibly undermined the <u>Miranda</u> warnings, falsely promised leniency, and minimized the nature of the alleged offense. Relying on <u>L.H.</u>, 239 N.J. at 44, <u>State v. O.D.A.-C.</u>, 250 N.J. 408, 423 (2022), and <u>State ex rel. A.S.</u>, 203 N.J. 131, 140, 151 (2010), defendant asserts due to Detective Peterson's statements, in the context of his cognitive disability, the State did not establish beyond a reasonable doubt defendant's waiver was knowing, intelligent, and voluntary.

Defendant further argues while Detective Peterson's statements may have been permissible in an interrogation with an adult of average or slightly below-average intelligence, the statements were impermissible in the context of defendant due to his cognitive disability. Defendant maintains several of Detective Peterson's statements downplayed the seriousness of the alleged offenses, improperly suggested the police would help him, and implied he would receive counseling instead of going to jail.

A-2106-21

He also asserts the trial court failed to consider defendant's cognitive disability when addressing Detective Peterson's statements. Finally, defendant argues Detective Peterson "contaminated" defendant's confession in that "most of what [defendant] confessed to simply mirrored the information already given to him by Peterson." We are similarly not persuaded by any of these arguments.

"Beyond the issue of waiver, there are separate due process concerns related to the voluntariness of a confession." O.D.A.-C., 250 N.J. at 421. It is the State's burden to "prove beyond reasonable doubt" defendant's statements during an interrogation were "not made because his will was overborne." Ibid. (quoting L.H., 239 N.J. at 42).

First, courts recognize it is "simply wrong" for officers to "[r]efer[] to Miranda warnings as a 'formality'" as doing so improperly "downplays their significance" as a constitutional requirement. O.D.A.-C., 250 N.J. at 422. Additionally, "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other." L.H., 239 N.J. at 44 (quoting State v. Pillar, 359 N.J. Super 249, 268 (App. Div. 2003)).

For example, an officer "[s]uggesting or promising that an interrogation will remain confidential . . . directly contradicts one of Miranda's core warnings." O.D.A.-C., 250 N.J. at 422. Similarly, the suggestion statements

"will not work against" or "could only help" a suspect is "at odds with <u>Miranda's</u> warnings that a suspect's statements can in fact be used against the person." <u>Id.</u> at 422-23 (citing <u>L.H.</u>, 239 N.J. at 44). Indeed, as Chief Justice Rabner explained, "[a]ll defendants run the risk that their words will be used directly against them at trial to secure a conviction." <u>Id.</u> at 423; <u>see also</u> <u>State v. Puryear</u>, 441 N.J. Super. 280, 289-89 (App. Div. 2015) (holding defendant's statement inadmissible because the interrogating officer stated, "[t]he only thing you can possibly do here is help yourself out. You cannot get yourself in any more trouble than you're already in. You can only help yourself out here.").

Additionally, "[f]alse promises of leniency -- promises 'so enticing' that they induce a suspect to confess -- have the capacity to overbear a suspect's will and to render the confession involuntary and inadmissible." <u>L.H.</u>, 239 N.J. at 27; <u>see</u> <u>also</u> <u>Hreha</u>, 217 N.J. at 383 (holding a promise of leniency was impermissible where officers told suspect he would avoid "traditional criminal prosecution" and receive "a slap on the wrist" if he confessed).

With those presumptions at the forefront, courts nevertheless recognize a suspect's "'natural reluctance' to furnish details implicating [themselves] in a crime." <u>L.H.</u>, 239 N.J. at 43 (quoting <u>State v. Miller</u>, 76 N.J. 392, 403 (1978)). Accordingly, officers may engage in certain interrogation tactics to overcome

A-2106-21

such reluctance.  Id. at 43-44.  Officers have leeway "to tell some lies during an interrogation," and may also appeal to the suspect's "sense of decency and urge[] him to tell the truth for his own sake."  Id. at 44 (quoting Miller, 76 N.J. at 405).

In Miller, the court considered:

> whether an interrogating officer can appeal to a suspect by telling him that he is the suspect's friend and wants to help him . . . . Does the officer have the right to tell the suspect that he must help himself first by telling the truth and then the officer will do what he can to help the suspect with his problem?
>
> [Miller, 76 N.J. at 404.]

The court acknowledged "this technique moves into a shadowy area and if carried to excess in time and persistence, can cross that intangible line and become improper."  Id. at 404.  The court also stated, however, "[e]fforts by an interrogating officer to dissipate" a suspect's "natural reluctance to admit to the commission of a crime" "and persuade the person to talk" are proper unless the suspect's will is overborne.  Id. at 403.

As such, the Supreme Court declined to "adopt a bright-line rule that would require suppression any time an officer makes an improper comment during an interrogation."  O.D.A.-C., 250 N.J. at 423.  Rather, courts determine if a defendant's confession was voluntary by assessing the totality of the circumstances and consider the same factors as when considering if a

34

defendant's waiver of Miranda was knowing and intelligent, namely, "the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." Id. at 421, 423 (internal citations omitted). "Those factors are assessed 'qualitatively, not quantitatively.'" State v. Erazo, 254 N.J. 277, 301 (2023) (quoting Hreha, 217 N.J. at 384). Courts also consider "statements and behaviors by the police which tend to contradict the Miranda warnings, or otherwise render them ineffective." Ibid.

Against this record, we are not persuaded by defendant's reliance on either L.H., 239 N.J. at 44, or O.D.A.-C., 250 N.J. at 408. In O.D.A.-C. the Supreme Court held a defendant's confession inadmissible because police undermined and contradicted Miranda warnings both prior to and throughout the interrogation. 250 N.J. at 413. Specifically, police referred to the warnings as "[j]ust a formality," and told the defendant what was discussed in the interrogation was "confidential between us," and "staying between us." Id. at 413, 415. Police also informed defendant, "[a]nything you say . . . is only going to help you; it's not going to hurt you." Id. at 423. The court reasoned such statements impermissibly contradicted Miranda, and as such, the State could not meet its

35

burden under the totality of the circumstances establishing defendant's statements were voluntary.  Id. at 425.

In L.H., the court held the State failed to prove beyond a reasonable doubt defendant's statement was voluntary because police made "(1) representations that directly conflicted with the Miranda warnings, (2) promises of leniency by offering counseling as a substitute for jail, and (3) statements that minimized the seriousness of the crimes under investigation."  239 N.J. at 47.  Considering all as relevant factors under the totality of the circumstances test, the court held the State failed to show beyond a reasonable doubt police's representations "did not overbear [the defendant's] will and induce him to confess."  Id. at 53.

With respect to false promises of leniency, the court noted police "suggested that, if defendant cooperated and incriminated himself, he would receive counseling and help, not go to jail, and remain free to raise his child."  Id. at 32.  The court stated promises of "help" and "counseling" were a "consistent theme" throughout the interrogation.  Id. at 31.  Police encouraged the defendant to be honest and told him, "the truth will set you free."  Id. at 32.  When defendant told detectives he was previously jailed "after he told 'the truth' to police," the detectives "allayed [his] concerns," and stated, "[w]ell that's not

36

gonna happen," and "[i]f I'm gonna lock you up, I'm gonna tell you I'm gonna lock you up." Ibid.

Police also told defendant they would get him counseling and "coupled those representations with the assurance that if he told the truth he would not go to jail." Id. at 48. Detectives told defendant, "I know with the right help . . . you'll be fine down the road," and "we're also trying to help you rebuild for your future." Id. at 32. Detectives made clear, however, "defendant had to be honest to receive counseling and help – and remain free to raise his child." Ibid. Defendant asked detectives if he was going to jail that night, and police responded, "no, not at all." Ibid. When the defendant asked, "[t]he help I need is not sending me to jail is it[]," police responded, "[n]ot at all. Nobody gets rehabilitated in jail." Id. at 33. The court noted such assurances "were aimed at assuaging the reluctance defendant repeatedly expressed about giving up the right to remain silent." Ibid.

Additionally, detectives "continually minimized the nature of the sexual assaults defendant was suspected of committing," stating more than once defendant was "not a bad guy," and he "didn't hurt anybody," as well as noting to defendant he "didn't rob them," "didn't beat them up," and "treated them okay" and "with respect." Id. at 33-34.

Here, we are mindful Detective Peterson made statements referring to counseling, minimized the seriousness of the offenses, and expressed a desire to help defendant. We are satisfied, however, in context and when considered within the totality of the circumstances of defendant's interrogation, those comments do not warrant suppression of defendant's statements as they did not overbear defendant's will or support defendant's argument his statements were anything other than voluntary and knowing.

First, we are convinced after considering Detective Peterson's statements in the context of the entirety of the interrogation, against the totality of the circumstances standard, render defendant's interrogation distinguishable from that which occurred in O.D.A.-C. and L.H. With respect to contradicting defendant's Miranda rights, unlike the officers in O.D.A.-C., Detective Peterson did not minimize, downplay, or trivialize defendant's Miranda rights. He did not refer to them as a formality or rush through reading defendant his rights. On the contrary, when it was evident defendant did not understand right number seven, Detective Peterson explained it to him and stated, "you don't have to talk to us if you don't want to. You can start talking and then stop . . . or you can have an attorney here if you want one . . . you can have an attorney before or

38

during questioning." Before beginning questioning, Detective Peterson again confirmed defendant's desire to speak to police without an attorney.

Additionally, as opposed to the officers in O.D.A.-C. and L.H., Detective Peterson did not contradict the Miranda warnings. Unlike the officers in O.D.A.-C., Detective Peterson did not suggest to defendant their conversation would remain confidential. Further, unlike the officers in both O.D.A.-C. and L.H., Detective Peterson did not state or imply defendant's words would not be used against him. Rather, Detective Peterson told defendant if he did not do what J.J. accused him of, Detective Peterson could help him "clear [his] name," and "if something did happen," Detective Peterson could help him "explain why it happened." Neither statement conflicted with Miranda warnings as neither implied the conversation would be confidential or that incriminating statements would not be used against defendant.

Additionally, unlike in L.H., Detective Peterson did not falsely tell defendant he was not going to jail and could instead receive counseling. Rather, Detective Peterson told defendant it is not up to police to determine where the people they speak to are "supposed to be . . . but there's help in counseling and therapy for stuff like that," and "[p]eople don't get better in jail." Detective Peterson also told defendant, "[i]f there's something you need help with, there

39

is help for that," and "it sounds like you need help, but you haven't been to a counselor or a therapist and maybe there's medication that can help you out."

Importantly, however, as opposed to the officers' statements in L.H., Detective Peterson's references to counseling did not go so far as to suggest such would be an alternative for jail in the event of a confession and arrest. We also note, unlike in L.H., Detective Peterson's statements referring to counseling were not coupled with statements undermining or contradicting Miranda, an important consideration in the totality of the circumstances.

Next, we find defendant's arguments regarding Detective Peterson's statements with respect to the minimization of the offense, and their consideration within the totality of the circumstances, akin to those found permissible in the recent case of Erazo, 254 N.J. at 304. There, the Supreme Court held a defendant's Miranda waiver was voluntary despite officers' being "persistent," "persuasive," and "frequently appeal[ing] to defendant's conscience." Ibid. While investigating a rape and murder, a police officer told defendant during a custodial interrogation, "this isn't an arena that you want to bulls**t around . . . my job is to sit here and to help you through this. Okay? I know mistakes happen. I know things happen. I know that you're not a monster." Id. at 288. Officers also told defendant they had "done this job long

enough to know that just because of the person sitting here and the things that we have is not a direct reflection," and they "have to get into a dialogue about this because . . . we've got stuff." Ibid. Officers went on to say, "I want you to understand the gravity that you're not being judged. You're not being looked at. Things happen," and "[t]he hardest part right now is for you to . . . be able to open your mouth and start talking to me about something that you know is heinous, you know is not good, but you also know is a mistake." Id. at 289. Officers also appealed to defendant stating, "[d]on't let a moment of weakness define you as a person," and "[y]ou're [eighteen] years old. You have your entire life ahead of you." Ibid.

In concluding the defendant's waiver was voluntary, the court stated officers "did not undermine Miranda in a way that our cases forbid," and "[o]ur case law requires more than what occurred here to undermine Miranda." Id. at 304. The court reasoned officers did not undermine Miranda because they did not "promise leniency, nor . . . suggest that defendant's words could not hurt him." Ibid. Rather, officers addressed defendant in a "quiet, conversational, almost paternalistic tone," informed him they were not judging him because "things happen," and "that there was value in having a dialogue about what happened." Ibid.

Indeed, in both Erazo and this case, officers appealed to the defendants' sense of decency. Specifically, officers made statements informing defendants they knew people made mistakes and defendants were not "monster[s]." As noted, our courts allow such appeals to decency so long as they are "not carried out to excess in time and persistence," thereby "cross[ing] that intangible line and becom[ing] improper." See Miller, 76 N.J. at 404-05.

We also recognize Detective Peterson told defendant "nobody was hurt," but we conclude that statement is not sufficiently similar to those made in L.H., where officers minimized the offense when, referring to victims, told defendant he "treated them okay," and "with respect" because he "didn't rob them," and "didn't beat them up." Further, we conclude Detective Peterson's interrogation of defendant is distinguishable from the interrogation in L.H. when considering the totality of the circumstances. In L.H., the court found officers impermissibly overbore defendant's will not only because of the officers' statements minimizing the seriousness of the offense, but also due to officers' statements directly conflicting with Miranda and offering false promises of leniency in the form of counseling as a substitute for jail. 239 N.J. at 47. Here, however, as in Erazo, because police did not contradict Miranda warnings or offer false promises of leniency, we are satisfied Detective Peterson's persistent engaging

42

with defendant in a conversational tone did not "cross the intangible line" and impermissibly overbear defendant's will when considered within the totality of the circumstances. Miller, 76 N.J. at 404-05.

Defendant notes the court failed to consider his cognitive disability when considering Detective Peterson's statements, but does not argue such failure is an independent ground for reversal. As such, although we acknowledge the trial court did not specifically address Detective Peterson's statements in its written opinion in this context, the statements were read during testimony and referenced during closing arguments. Additionally, the court viewed the entirety of defendant's interview. The trial court was aware of Detective Peterson's statements and found, under the totality of the circumstances, defendant knowingly, intelligently, and voluntarily waived his Miranda rights. Having undertaken "a searching and critical review of the record," Hreha, 217 N.J. at 381-82, we agree.

To the extent we have not specifically addressed any of defendant's arguments it is because we have concluded they are of insufficient merit to warrant further discussion in a written opinion. See R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2106-21